**NATIONAL TREASURY EMPLOYEES UNION, Plaintiff,**

v.

**Carol Boyd HALLETT, Commissioner U.S. Customs Service, Defendant.**

**No. CV–89–4172.**

United States District Court, E.D. New York.

Oct. 28, 1991.

Gregory O'Duden, Director of Litigation, Nat. Treasury Employees Union, Washington, D.C., and Arthur Z. Schwartz, Lewis, Greenwald, Kennedy, Lewis, Clifton & Schwartz, New York City, for plaintiff.

Peter Robbins, Dept. of Justice, Civ. Div., and Drew Hatcher, U.S. Customs Service, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

This case, in which a union representing employees of the United States Customs Service challenges the constitutionality of a random drug testing program, is before the court on cross motions for summary judgment. The parties have prepared an extensive Stipulation of Facts, and it is on that submission which the court primarily relies for the factual basis of its decision. As is set forth hereafter, the Customs Service random drug testing program is reasonable under the Fourth Amendment and defendant is entitled to summary judgment.

## BACKGROUND

The United States Customs Service is the nation's primary border enforcement agency. Responding to the seemingly inexhaustible flow of illegal drugs across our

borders, the Customs Service has made drug interdiction its primary mission. It is a mission of the highest national importance, and one which often has many of the characteristics of war: espionage and infiltration, reconnaissance and surveillance, combat and capture. Many of the men and women of the Customs Service carry firearms and operate under and out of cover in dangerous theaters where a moment's misjudgment can be deadly. Danger may also present itself to these men and women in the form of temptation, as the drug trade offers wealth well beyond the reach of most. Many have access to enormous quantities of seized drugs both prior to seizure and in Customs Service custody. And many have access to sensitive computer databases containing highly sensitive drug enforcement information.

Armed with the conviction that the federal workplace is not immune to the problem of illegal drug abuse and with the technology to test for such usage, the Customs Service in 1986 implemented a program of urinalysis drug testing for internal and external applicants tentatively selected for placement in positions involving drug interdiction, firearms, or the handling of certain highly sensitive information. In a decision that will be discussed at length below, the Supreme Court upheld the constitutionality of that plan. *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (hereafter *"Von Raab"*).

More recently, the Customs Service has proposed the extension of that plan to incumbents—specifically, to those involved in accidents, those for whom there is a reasonable suspicion of drug use, those who volunteer for testing, and those who occupy "sensitive" positions. This last group, members of which would be tested by random selection, would be composed of incumbents in positions which involve drug interdiction or which have duties which can affect the public's safety, namely, the carrying of a firearm or operation of a motor vehicle or forklift. Although no position is testing-designated solely because of access to material classified as a national security secret, some incumbents do

have such access, and the Customs Service further justifies the testing of those incumbents on that basis. Twenty-eight different positions within the National Treasury Employees' Union collective bargaining unit are subject to random testing, covering some 6,600 employees. Roughly 5,900 of those employees are Customs Inspectors. It is this random component of the new testing plan which plaintiffs challenge as unconstitutional.

## FACTS

### 1. *The Random Testing Plan*

The procedures of the random drug testing program are set forth in the Mandatory Guidelines for Federal Workplace Drug Testing Programs, 53 Fed.Reg. 11,970 (1988). First, the plan provides a two-step advance notification process. No later than 60 days before random testing may commence, the Customs Service will issue a general notice to employees informing them of the drug testing program and describing the circumstances under which testing may occur. In addition, employees in testing-designated positions are notified no less than 30 days before they are subject to random testing. A signed acknowledgment of this notification is obtained from the employee, who may, if he feels that his position has been improperly chosen for random testing under the program's criteria, file a grievance and seek a reversal of that decision through an administrative process. An employee selected for actual testing is notified within two hours of the scheduled test, and is informed that he is under no suspicion of taking drugs and that his name was selected randomly.

Employees in the testing-designated positions are tested at a rate of 10% per year, with employees selected by a computer using social security numbers. Urine sample production and analysis is performed according to the same protocol as that which the Customs Service uses for applicant testing and which was described in *Von Raab:*

On reporting for the test, the employee must produce photographic identification and remove any outer garments, such as a coat or a jacket, and personal belongings. The employee may produce the sample behind a partition, or in the privacy of a bathroom stall if he so chooses. To ensure against adulteration of the specimen, or substitution of a sample from another person, a monitor of the same sex remains close at hand to listen for the normal sounds of urination. Dye is added to the toilet water to prevent the employee from using the water to adulterate the sample.

Upon receiving the specimen, the monitor inspects it to ensure its proper temperature and color, places a tamper-proof custody seal over the container, and affixes an identification label indicating the date and the individual's specimen number. The employee signs a chain-of-custody form, which is initialed by the monitor, and the urine sample is placed in a plastic bag, sealed, and submitted to a laboratory.

The laboratory tests the sample for the presence of marijuana, cocaine, opiates, amphetamines, and phencyclidine. An initial screening uses the enzyme-multiple-immunoassay technique (EMIT). Any specimen that is identified as positive on this initial test must then be confirmed using gas chromatography/mass spectrometry (GC/MS). Confirmed positive results are reported to a "Medical Review Officer," "[a] licenced physician ... who has knowledge of substance abuse disorders and has appropriate medical training to interpret and evaluate the individual's positive test result together with his or her medical history and any other relevant biomedical information. After verifying the positive result, the Medical Review Officer transmits it to the agency."

*Von Raab,* 489 U.S. at 661–62, 109 S.Ct. at 1388–89.

### 2. *The Testing–Designated Positions*

Each of the testing-designated positions is now described. Except in the instance where indicated, these facts are by stipulation of the parties.

### (a) Customs Inspectors, Canine Aircraft Inspectors, Canine Enforcement Officers

Customs Inspectors are responsible for enforcing customs and related laws at ports of entry into the United States. They inspect and process incoming baggage, passengers, cargo, airplanes, ships, and other conveyances, and interdict contraband. Some are assigned to specialized units which target particular persons, places, or arrivals for inspection and enforcement action based on intelligence information. They are empowered to search persons and things, seize contraband, arrest and detain suspects, and to use deadly force if necessary. All are authorized to carry firearms and must be proficient in their use. The majority do carry firearms.

Customs Inspectors may work in dangerous conditions exposing them to possible physical attack and lethal weapons. They can have contact with drug smugglers both alone or in the presence of other Customs employees. They are required to pass a medical examination and must undergo a background investigation prior to employment.

Canine Enforcement Officers and Canine Aircraft Inspectors perform essentially the same duties as Customs Inspectors, except that they perform searches using animals trained to detect illegal drugs.

All Customs Inspectors, Canine Enforcement Officers, and Canine Aircraft Inspectors have access to a multi-agency, limited-access computerized database known as the Treasury Enforcement Communications System ("TECS"). It contains an array of non-public information related to drug interdiction including suspect subject records, which contain lookouts issued by the Customs Service, Drug Enforcement Agency, Justice Department, Coast Guard, and other law enforcement agencies for persons and conveyances suspected of involvement in drug smuggling. The lookouts contain the names or identifying characteristics of targets and expected times and places of entry into the United States;

identifying characteristics of aircraft, vessels and vehicles targeted for detention and searches at points of entry; specific locations and times targeted for special scrutiny on the basis of intelligence information; and suspicious modes of operation. The TECS database also contains non-suspect subject records which include registrations of pilots and navigators, flight plans, and records of the history of searches and seizures, including the frequency with which a particular pilot is normally subject to search. TECS also contains search, seizure and arrest reports, including the manner in which the contraband was found, intelligence reports on suspected smuggling activity, names of informants, and investigatory techniques used. It also contains the Federal Bureau of Investigation's National Crime Information Center ("NCIC") records with the names and identifying characteristics of wanted persons and suspected vehicles, as well as National Law Enforcement Telecommunications Systems records which contain information from state law enforcement authorities similar to that in NCIC. This information all relates to specific individuals or groups, not merely to general classes of violators.

Customs Inspectors also have access to a less sensitive database known as the Automated Commercial System ("ACS"). The ACS is a telecommunications system designed to facilitate the filing of import documentation such as declarations of entry, invoices and bonds. It is divided into 13 modules, most of which are unrelated to drug interdiction. One module contains fine, penalties and forfeiture records, containing the name and address of the alleged violator of drug-smuggling or other laws, the names and addresses of known or suspected associates, type and quantity of drugs seized, and other information. Also within the ACS are cargo selectivity criteria, which identify characteristics to be used by the Customs Service to determine how items and conveyances are subject to searches.

(b) Customs Mail Specialists

Customs Mail Specialists work in mail facilities to inspect materials entering the country through the mails. Their work involves the examination of the exterior of packages and letters and the examination of the contents of some. Incumbents have discretion to determine what letters and parcels are opened. They may also be assigned to special processing teams which target specific parcels. Incumbents who discover illegal drugs report to a Customs Inspector and secure the contraband until the Customs Inspector arrives to take custody of it. They perform most of their work in receiving areas for passengers, baggage and cargo, and often in an office setting. They have access to the same information in the TECS and ACS databases to which Customs Inspectors have access. They are not authorized to make arrests and do not carry firearms, but are required to pass a medical examination and undergo a background investigation.

(c) Customs Inspection Assistants, Customs Inspection Clerks

Customs Inspection Assistants assist Customs Inspectors in their inspection and clerical duties. Their duties specifically include (1) assisting in searches and serving as witnessing officers during personal searches, (2) preparation and maintenance of files in the TECS and ACS databases, (3) posting and daily review of lookouts in the TECS system, (4) daily review of other drug-interdiction intelligence bulletins for inclusion in the TECS source records, (5) inventory of seized contraband, (6) preparation of chain-of-custody forms and documentation of destruction of contraband, (7) maintenance of administrative records, (8) fingerprinting of arrested suspects, and (9) routing of passengers and cargo through customs processing facilities while watching for unusual or suspicious behavior. They do not have arrest powers but are authorized to detain persons who attempt to flee or circumvent inspection. They have access to the same information in the TECS and ACS databases to which Customs Inspectors have access. They may have access to seized contraband within the chain-of-custody, and may on occasion have unsupervised contact with drug-smugglers

during fingerprinting. They work under the supervision of Customs Inspectors and in the same environment as Customs Inspectors. Some are required to carry firearms, although most do not, and all are required to undergo background investigations.

Customs Inspection Clerks are essentially a lower grade of Customs Inspection Assistant, performing similar duties under a greater degree of supervision. They are not authorized to carry firearms, do not have arrest powers, and do not have access to drug-related information in the TECS database. They do have access to cargo selectivity criteria in the ACS database, and they are required to undergo a background investigation.

(d) Security Assistants

Security Assistants provide surveillance at Customs points of entry by operating a closed circuit television system to monitor the movements and behavior of persons arriving on international flights. Suspicious activity is reported to a Customs Inspector or other law enforcement official. They do not make arrests, do not carry firearms, and do not require face-to-face contact with smugglers. Most do not have access to the TECS database; they do, however, have access to the ACS database. They are required to undergo a background investigation.

(e) Operational Analysts, Operational Analysis Specialists, Operational Enforcement Analysts, Program Analysts (Inspection and Control)

Operational Analysts, Operational Analysis Specialists, and Operational Enforcement Analysts consist primarily of former Customs Inspectors who conduct studies and research to assist field personnel in performing their duties more effectively. Using information gathered from a variety of sources, including confidential informants and other federal law enforcement agencies, incumbents disseminate intelligence bulletins used by field personnel to detect and apprehend smugglers. They also revise the cargo selectivity criteria in the ACS database. They have the same access to the TECS and ACS databases as Customs Inspectors have. They are not authorized to make arrests, do not conduct searches and seizures, do not carry firearms, have no or limited contact with drug smugglers, and do not require access to contraband. Their work is performed almost entirely in an office environment. They are required to undergo a background investigation.

Program Analysts (Inspection and Control) perform under similar conditions but study and assess the overall effectiveness of inspection and enforcement efforts. They consider the allocation of resources and the distribution of workloads. They may also analyze specific problem areas, such as drug interdiction or cargo inspection. As part of their work, they generate daily enforcement activity reports which contain information about seizures of illegal drugs, currency and other contraband. In other respects they are similar to Operational Analysts.

(f) Sales and Seizure Specialists

Sales and Seizure Specialists are the custodians of seized property and unclaimed merchandise. They operate facilities which serve as repositories for large stores of seized items, which may include illegal drugs, explosives and weapons. They are responsible for ensuring that seized items are properly accounted for, controlled, documented and released. They assist in the destruction of illegal drugs, and may weigh seized contraband prior to destruction. They thus have access to illegal drugs within the chain-of-custody. They work under the supervision of the head of the Sales and Seizure Unit, and may act without supervision; however, destruction of illegal drugs requires two Customs employees to be present. They do not have access to the TECS database but do have access to the ACS database, do not make arrests, do not conduct searches and seizures, do not carry firearms, and do not operate heavy equipment. They must undergo a background investigation.

(g) Seized Property Custodians, Seized Property Management Specialists

Seized Property Custodians and Seized Property Management Specialists are responsible for the custody and secure storage of seized, forfeited and abandoned property from the point of its initial acceptance to the point of final disposition. They may accept custody of seized goods directly from the seizing officer within chain-of-custody procedures. They may also assist in the destruction of illegal drugs, and may weigh the drugs to assure that the weight agrees with the original amount accepted. They have access to the TECS and ACS databases, do not make arrests, do not conduct searches or seizures, do not carry firearms, do not have contact with smugglers, and do not operate heavy equipment. They are required to undergo a background investigation.

(h) Seized Conveyance Specialists, Secure Storage Technicians, Secure Storage Specialists, Secure Storage Custodians

Seized Conveyance Specialists, Secure Storage Technicians, Secure Storage Specialists, and Secure Storage Custodians are responsible for custody of contraband and seized property, including illegal drugs, maintaining inventory and documentary controls, and other clerical tasks. They escort and arrange for escort of controlled substances to the Customs Training Center and arrange for destruction of the drugs after their value as training materials has been lost. They also conduct security vulnerability assessments to identify and correct potential hazards which could lead to the loss, theft, misuse or damage of seized property, including illegal drugs, explosives and weapons. They have access to contraband within the chain-of-custody.

They are authorized to carry firearms and have access to the ACS, but not TECS, database. They do not make arrests, do not conduct searches and seizures, and do not require access to smugglers. Their work is performed mostly in a warehouse setting. They are required to undergo a background investigation.

(i) Packers–Openers–Verifiers

These incumbents assist in inspections at high-volume locations by opening cases, boxes, crates and other containers and arranging their contents for inspection by Customs Inspectors, Mail Specialists, Import Specialists and Agents. They verify and check contents against manifests and invoices. When the inspection is completed they repackage the material. They may also operate motor vehicles and transport seized contraband and property, including illegal drugs, within the chain-of-custody, to the Fines, Penalties and Forfeitures Officer, and in some instances, to the office of the United States Attorney for use as evidence in criminal proceedings. When in the course of their duties they encounter contraband, including illegal drugs, they notify a supervisor, who then secures the material and notifies a Customs Inspector to take custody of it. Their work is performed generally under supervision in cargo receiving areas and office environments.

Incumbents do not have arrest powers, are not required to have contact with drug smugglers, do not have access to the TECS and ACS databases, do not carry firearms, and are not required to operate heavy equipment. They are required to undergo a background investigation.

(j) Forklift Operators, Warehouse Workers (Forklift Operators)

Incumbents in these positions operate forklifts and platform vehicles for the purpose of moving merchandise around warehouses. Forklift Operators may use forklifts capable of lifting 10,000 pounds to a height of 12⅓ feet. Warehouse Workers (Forklift Operators) use forklifts capable of lifting 6,000 pounds to a height of 9 feet. Incumbents may also be required to assist Opener–Packer–Verifiers. They have access to contraband, including illegal drugs, within the chain-of-custody. They do not make arrests, do not conduct searches and seizures, do not require contact with smugglers, do not carry firearms, and do not have access to the TECS or ACS databases. All incumbents are required to pass a medical examination and a background investi-

gation. Their work is performed in a warehouse setting.

### (k) Motor Vehicle Operators, Messengers (Motor Vehicle Operators)

Motor Vehicle Operators drive cars, trucks and vans to deliver packages, mail and currency. About 75% of the operator's time is spent carrying packages and about 15% carrying passengers, who may be Customs Service officials on official business. The remaining time is spent receiving, logging and sorting mail and shipments, including incoming checks and certified mail, in mailrooms. Incumbents maintain vehicles in clean and safe operating condition and may be required to make minor repairs and adjustments to vehicles.

Incumbents may require access to contraband, including illegal drugs, within the chain-of-custody. They do not make arrests, do not conduct searches or seizures, do not have contact with smugglers, and do not have access to TECS or ACS. They do not carry firearms or operate heavy equipment (other than motor vehicles). Their work is performed mainly on the roads unsupervised or in a mail room. All must undergo a medical examination and background investigation.

### (l) Paralegal Clerks, Paralegal Assistants, Paralegal Specialists

Paralegal Clerks and Paralegal Assistants serve in the Fines, Penalties and Forfeitures Program and are involved in the processing and adjudication of civil liabilities arising from seizures, penalties and claims for liquidated damages. Their duties include receiving incoming legal documentation, reviewing and filing legal instruments, performing basic legal research, collecting payments, preparing tickets for the release of seized merchandise, and assisting Seized Property Custodians in maintaining and disposing of seized contraband. Incumbents have access to the ACS database but not to the TECS database. They do not make arrests, do not conduct searches or seizures, and do not require contact with smugglers. They perform their duties in an office setting and must undergo a background investigation.

The position of Paralegal Specialist is for reason unknown not described in the Stipulation of Facts. However, plaintiff's Appendix 1, summarizing the duties of each position, notes that Paralegal Specialists, like Paralegal Clerks and Assistants, also have access to contraband in the chain-of-custody as well as access to cargo selectivity criteria in the ACS database.

### (m) Chemists

Chemists perform analyses on seized contraband, including illegal drugs, to determine chemical composition and other attributes. Some Chemists specialize in performing tests on non-drug materials unrelated to drug interdiction. However, all Chemists may be required to perform analysis on illegal drugs, and no Chemist is exempt from that requirement. Declaration of Jimmy E. Harrell, Defendant's Exh. 7.

Tests on illegal drugs are conducted in the same laboratory rooms as tests on other materials. When not being tested, drugs are stored in the laboratory room where tests are performed or in an adjoining room. The drugs are kept in either a secured steel cabinet, safe or vault, which must be located in view of at least one Customs employee during working hours. As an additional security measure, stored drugs are randomly weighed and inventories checked. Where very temporary storage is needed—such as when a Chemist is called away to the telephone—drugs are placed in a locked drawer or lockbox. Access to areas where drugs are analyzed and stored is limited to Chemists and other persons with a need for access. All access is within the chain-of-custody.

Chemists perform their work in a laboratory and do not have access to TECS or ACS. They do not conduct arrests or searches, do not have contact with drug smugglers, do not carry firearms, and do not operate heavy equipment.

**(n) Student Trainees**

Student Trainees are hired to perform the duties of Customs personnel under close supervision. Inspectional Student Trainees assist in questioning passengers and routing passengers, baggage and cargo. They assist in searches and seizures, in which capacity they may have access to contraband and contact with smugglers. They have access to the TECS and ACS databases, but do not have arrest powers or carry firearms. They are required to both pass a medical examination and undergo a background investigation.

Chemist Trainees perform the same duties as Chemists and work in the same environment. They are not required to pass a medical examination, but are required to undergo a background investigation.

General Student Trainees assist in the compilation of data and records concerning areas such as workload changes and import patterns. Most have access to the TECS and ACS databases, although three incumbents have no access to TECS. They do not have arrest powers, do not conduct searches or seizures, do not carry firearms, do not generally have access to contraband, and do not operate heavy equipment or a motor vehicle. They are required to pass a medical examination, and must undergo a background investigation.

## DISCUSSION

■ Much of the legal framework in which the Customs Service random drug testing plan must be analyzed is now well-established. First, the taking of urine for the purpose of determining drug use is a search within the meaning of the Fourth Amendment. *Von Raab*, 489 U.S. at 663–66, 109 S.Ct. at 1389–91; *Skinner v. Railway Labor Executives' Assoc.*, 489 U.S. 602, 617–28, 109 S.Ct. 1402, 1412–19, 103 L.Ed.2d 639 (1989) (hereafter *"Skinner"*); *Hartness v. Bush*, 919 F.2d 170, 172 (D.C.Cir.1990). Second, as the Fourth Amendment guards against unreasonable searches and seizures by officials of the government and their agents, *Camara v. Municipal Court*, 387 U.S. 523, 528, 87

S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967), to comport with the requirements of the Fourth Amendment urinalysis testing must be reasonable. *Von Raab*, 489 U.S. at 665–66, 109 S.Ct. at 1390; *Skinner*, 489 U.S. at 618–19, 109 S.Ct. at 1413–14.

■ To be reasonable, a search performed without a warrant must generally be justified by probable cause to believe the person searched has violated the law. *Skinner*, 489 U.S. at 624, 109 S.Ct. at 1417. In the absence of probable cause, a search must usually be based at least on "some quantum of individualized suspicion." *United States v. Martinez–Fuerte*, 428 U.S. 543, 560, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976). However, *Von Raab* and *Skinner* now conclusively establish that random drug testing may not require a warrant, probable cause, or any level of individualized suspicion for reasons explained:

> It is clear that the Customs Service's drug-testing program is not designed to serve the ordinary needs of law enforcement. Test results may not be used in a criminal prosecution of the employee without the employee's consent. The purposes of the program are to deter drug use among those eligible for promotion to sensitive positions within the Service and to prevent the promotion of drug users to those positions. These substantial interests, no less than the Government's concern for safe rail transportation at issue in *Railway Labor Executives'*, present a special need that may justify departure from the ordinary warrant and probable-cause requirements.

*Von Raab*, 489 U.S. at 666, 109 S.Ct. at 1390–91. *See also Skinner*, 489 U.S. at 624, 109 S.Ct. at 1417; *Hartness v. Bush*, 919 F.2d at 172; *Taylor v. O'Grady*, 888 F.2d 1189, 1194 (7th Cir.1989). Reasonableness thus depends on a finding that the individual's privacy interests implicated by the search are outweighed by the governmental interest furthered by the intrusion. *Von Raab*, 489 U.S. at 665–66, 109 S.Ct. at 1390–91; *Skinner*, 489 U.S. at 624–26, 109 S.Ct. at 1416–18; *Harmon v. Thornburgh*, 878 F.2d 484, 488 (D.C.Cir.1989), *cert. de-*

*nied,* 493 U.S. 1056, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990). Thus, the court is required to balance the intrusiveness of the Customs Service testing program against the governmental interests they assert it serves.

### 1. *Governmental Interest*

Defendant argues that all employees designated for random testing work in sensitive positions implicating important government interests either by virtue of their involvement in drug interdiction or their use of a dangerous instrumentality. The Customs Service also argues that similarly important government interests are raised by the access many employees have to material classified as a national security secret.

### (a) Drug Interdiction

Drug interdiction activities, according to defendant, fall into nine categories:

1. Arresting or detaining suspects,
2. Assisting in arrests,
3. Conducting surveillance of suspicious activity,
4. Conducting searches and seizures of illegal drugs,
5. Assisting in searches and seizures,
6. Providing drug-interdiction intelligence to operatives in the field,
7. Studying weaknesses in anti-drug enforcement efforts and making recommendations on how to correct them,
8. Having access to confidential drug-related intelligence of value to smugglers, such as suspect look-out reports or cargo selectivity criteria, and
9. Having custodial responsibility for seized drugs.

Defendant argues that drug abuse may undermine employees' commitment to their mission, may cause employees to facilitate the importation of drugs or block the apprehension of smugglers, may expose employees to blackmail by criminals who are aware of their illegal habit, or may lead employees to utilize their access to stores of seized contraband to service their habit or to steal for profit.

*Von Raab* established that an employee's engagement in drug interdiction raises important government interests which may outweigh the employees' privacy expectations. *Von Raab,* 489 U.S. at 668, 109 S.Ct. at 1392. The record in this case establishes, as it did in *Von Raab,* that drug smugglers attempt to and often succeed in transporting huge quantities of drugs across our country's borders. They use sophisticated methods and schemes to escape detection, evading border controls entirely or passing through customs control points foiling searches. They also use deadly force against law enforcement personnel, including Customs Service employees, who interfere with their trade. *See* Hallet Declaration.

Internal integrity and security controls of the Customs Service have exposed and led to the apprehension of significant numbers of employees involved in illegal schemes. The Customs Service annual reports reveal that its office of internal affairs arrested 24 employees and 54 civilians in 1987, 21 employees and 78 civilians in 1988, 88 employees and civilians in 1989, and 25 employees and 83 civilians in 1990. In 1990 20 employees and 73 civilians were indicted as a result of those internal investigations. U.S. Customs Service, Customs U.S.A., Fiscal Years 1987–1990, Exh. to Second Hallet Declaration. A review of Custom Service internal integrity-related actions for the year 1991 reveals, *inter alia,* criminal actions based on theft of seized contraband in Custom Service custody, Second Hallet Dec. ¶ 12, operation of a drug importation and distribution enterprise, *id.* ¶ 14, bribery, *id.* ¶ 8, attempted bribery, *id.* ¶ 13; and conspiracy to import cocaine and marijuana. *Id.* ¶ 6. The threat of physical harm to Customs Service employees is also apparent. Since 1975, 11 officers have died in the line of duty. Hallet Dec. ¶ 7. "Customs officials have been shot, stabbed, run over, dragged from automobiles, and assaulted with blunt objects while performing their duties." *Id.*

The Supreme Court in *Von Raab* acknowledged the dangers and temptations with which employment in sensitive positions in the Customs Service is fraught:

Many of the Service's employees are often exposed to this criminal element and to the controlled substances it seeks to smuggle into the country.... The physical safety of these employees may be threatened, and many may be tempted not only by bribes from the traffickers with whom they deal, but also by their own access to vast sources of valuable contraband seized and controlled by the Service....

*Von Raab*, 489 U.S. at 669, 109 S.Ct. at 1392. The court concluded that the Customs Service effort to ensure that it elevated or hired drug-free personnel to these positions was well-justified:

It is readily apparent that the Government has a compelling interest in ensuring that front-line interdiction personnel are physically fit, and have unimpeachable integrity and judgment.... This national interest in self-protection could be irreparably damaged if those charged with safeguarding it were, because of their own drug use, unsympathetic to their mission of interdicting narcotics. A drug user's indifference to the Service's basic mission or, even worse, his active complicity with the malefactors, can facilitate importation of sizable drug shipments or block apprehension of dangerous criminals. The public interest demands effective measures to bar drug users from positions directly involving the interdiction of illegal drugs.

*Id.* at 670, 109 S.Ct. at 1393.

*Von Raab* suggests that the government's interest in assuring the integrity of its workforce would not justify drug testing for every federal employee: "[U]nlike most private citizens *or government employees in general,* employees involved in drug interdiction should reasonably expect effective inquiry into their fitness or probity." *Von Raab*, 489 U.S. at 672, 109 S.Ct. at 1394 (emph. added). *See Harmon v. Thornburgh*, 878 F.2d at 490 (*"Von Raab* ... suggests that federal employment alone is not a sufficient predicate for mandatory urinalysis."). *See also Taylor v. O'Grady*, 888 F.2d at 1196. Rather, drug testing is only justified where the government can show that "a direct nexus exists

between the nature of the employee's duty and the nature of the feared violation." *Harmon v. Thornburgh*, 878 F.2d at 490. Thus, citing insufficient nexus, the District of Columbia Circuit rejected as unreasonable a drug testing plan for all Department of Justice employees who were prosecutors or had access to federal grand jury proceedings:

[*Von Raab*] emphasized the particular dangers inherent in drug use by employees directly engaged in drug interdiction. No such nexus is present in this case. The fact that a DOJ employee is a federal prosecutor, has access to grand jury proceedings, or holds a security clearance in no way identifies her as an employee responsible for the enforcement of federal narcotics laws.

*Id.* The court permitted, however, that it was "quite possible" that a properly selected subset of that group "having substantial responsibility for the prosecution of federal drug offenders" could constitutionally be subjected to random drug testing. That court in a subsequent case found a sufficient nexus present for civilian drug counsellors in a United States Army Alcohol and Drug Abuse Prevention and Control Program. The court emphasized that drug abuse counsellors may, "because of their own drug use, [be] unsympathetic to their mission." *National Federation of Federal Employees v. Cheney*, 884 F.2d 603, 614 (D.C.Cir.1989), *cert. denied*, 493 U.S. 1056, 110 S.Ct. 864, 107 L.Ed.2d 948 (1990), *quoting Von Raab*, 489 U.S. at 670, 109 S.Ct. at 1393. The court found that the Army "maintains a legitimate interest" in ensuring its counsellors' "allegiance" to the program's goals. *Id.* In the same decision, however, the court found no similar compelling interest in drug testing employees of the urinalysis laboratory or who have access to the urine samples' chain-of-custody. The court found lacking "any compelling reason to expect that drug use will result in misplaced sympathies for their responsibilities," and rejected any assertion of nexus between the duties of a lab technician and the nature of the harm to be feared from drug abuse. *Id.*

*Von Raab* also establishes that the government has a compelling interest in drug testing employees whose positions involve access to contraband in custody: "Many may be tempted ... by their own access to vast sources of valuable contraband seized and controlled by the Service...." *Von Raab,* 489 U.S. at 669, 109 S.Ct. at 1392. A district court writing prior to *Von Raab* agreed:

> The need of the [New Orleans Police Department] to protect the "chain of evidence" arises from the fact that employees of the NOPD who are in sensitive drug enforcement positions are often exposed to large sums of cash and great quantities of controlled substances that have been seized and which constitute important evidence to be used to convict those from whom the items were seized. The illicit drug user may be tempted to divert for his own use portions of shipments that are seized.

*Weicks v. New Orleans Police Dep't,* 706 F.Supp. 453, 458–59 (E.D.La.1988) (internal quotation marks and citation omitted).

(b) Public Safety

Many Customs Service employees carry or are authorized to carry firearms, and some positions are testing-designated in part for that reason. Both *Von Raab* and *Skinner* explicitly recognized that the government has a compelling interest in drug testing employees who exercise control over a dangerous instrumentality. In *Von Raab* the court considered the government's interest in testing employees who carry firearms, and concluded:

> The public interest ... demands effective measures to prevent the promotion of drug users to positions that require the incumbent to carry a firearm, even if the incumbent is not engaged directly in the interdiction of drugs. Customs employees who may use deadly force plainly "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." [*Skinner,* 489 U.S.] at 628 [109 S.Ct. at 1419]. We agree with the Government that the public should not bear the risk that employ-

ees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force. Indeed, ensuring against the creation of this dangerous risk will itself further Fourth Amendment values, as the use of deadly force may violate the Fourth Amendment in certain circumstances.

*Von Raab,* 489 U.S. at 670–71, 109 S.Ct. at 1393. Numerous federal courts have fallen in line behind *Von Raab* in upholding random drug testing of armed employees. *See, e.g., Penny v. Kennedy,* 915 F.2d 1065, 1067 (6th Cir.1990) (police); *Taylor v. O'Grady,* 888 F.2d at 1196 (prison guards); *National Federation of Federal Employees v. Cheney,* 884 F.2d at 612–613 (civilian army guards); *American Federation of Government Employees, Local 1533 v. Cheney,* 754 F.Supp. 1409, 1423–24 (N.D.Cal.1990) (navy law enforcement officials); *Burka v. New York City Transit Authority,* 739 F.Supp. 814, 822 (S.D.N.Y.1990) (collection agents).

The Customs Service has also designated for testing certain positions which require incumbents to operate motor vehicles, with and without passengers, and forklifts. An increasing number of courts have upheld random drug-testing for motor vehicle operators on the ground that an automobile on the road is a dangerous instrumentality. *See, e.g., Plane v. United States,* 750 F.Supp. 1358, 1370 (W.D.Mich.1990) (upholding random drug testing of motor vehicle operators employed by Defense Logistics Agency: "It is clear that [motor vehicle operators] perform tasks in which a single lapse may cause serious injury or death."); *American Federation of Government Employees v. Sullivan,* 744 F.Supp. 294, 299–301 (D.D.C.1990) (upholding random drug testing of Department of Health and Human Services motor vehicle operators who carry passengers and packages: "The immediacy of a threat of severe injury is present in the operation of a motor vehicle, regardless of the number of passengers carried, or the fact that no passengers are carried at all...."); *American Federation of Government Employees v.*

*Cavazos,* 721 F.Supp. 1361, 1373 (D.D.C.1989) (upholding random drug testing of Department of Education motor vehicle operators responsible for transporting passengers, packages, and mail). Some courts have focused on the fact that a vehicle carries passengers or have upheld random testing for drivers of vehicles other than automobiles. *See, e.g., International Brotherhood of Teamsters v. Dep't of Transportation,* 932 F.2d 1292, 1306 (9th Cir.1991) (upholding random drug testing of truck drivers); *American Federation of Government Employees, Local 1533 v. Cheney,* 754 F.Supp. at 1422 (upholding random drug testing of Department of the Navy motor vehicle operators who routinely transport passengers); *Burka v. New York City Transit Authority,* 739 F.Supp. at 822 (upholding random drug testing of drivers of trucks and empty buses). *But see National Treasury Employees Union v. Watkins,* 722 F.Supp. 766, 769 (D.D.C.1989) (granting preliminary injunction against random drug testing of Department of Energy motor vehicle operators: "We believe that the safety risks involved with motor vehicle operators carrying out their duties are no greater than the normal risks associated with vehicle use by the general public. . . ."). An automobile is a dangerous instrumentality the impaired operation of which can lead to immediate disastrous consequences for both life and property. The court finds without hesitation that the Customs Service has a compelling interest in drug testing its employees who operate them.

The Customs Service employs forklift operators to move material within and around warehouses. Two types of forklifts are operated to shift and stack materials: those capable of lifting up to 10,000 pounds to a height of about 12 feet and those capable of lifting 6,000 pounds to a height of 9 feet. Either of these forklifts thus gives its operator the means to elevate and transport the weight of several automobiles. The threat posed by a lapse of control or judgment by a drug-impaired forklift operator is so obvious as to require no elaboration. Suffice to say the threat is both immediate and severe. As *Skinner*

held, the government has a legitimate interest in testing employees who "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Skinner,* 489 U.S. at 628, 109 S.Ct. at 1419. Moreover, an employee moving several tons at a height of a dozen feet may "have no chance to recognize and rectify his mistake, nor will other government personnel have an opportunity to intervene before harm occurs." *Harmon v. Thornburgh,* 878 F.2d at 491. I conclude that the government has a legitimate interest in requiring random drug tests for its forklift operators. *See also Plane v. United States,* 750 F.Supp. at 1370 (upholding random drug testing of forklift operators for the Defense Logistic's Agency).

(c) Access to Classified Material

One hundred eighty two Customs Inspectors, 37 former Customs Inspectors in operational analysis positions, and a smattering of other NTEU-represented employees have security clearances for access to classified material. All of the employees within the NTEU bargaining unit who have access to classified information have clearances at the "top secret" or "secret" levels.

Material is classified as "top secret" or "secret" by government officers when it is determined that its unauthorized disclosure would cause "exceptionally grave" or "serious" damage, respectively, to the national security of the United States. Executive Order 12,356, §§ 1.1(a)(1), (2), 47 Fed.Reg. 14,874 (1982). A third category of classification, "confidential," is used for material which would be likely to cause damage to the national security. *Id.* § 1.1(a)(3).

In *Von Raab,* the Supreme Court stated that it "readily agree[d] that the Government has a compelling interest in protecting truly sensitive information" and that "employees who seek promotions to positions where they would handle sensitive information can be required to submit to a urine test under the [Customs] Service's screening program." *Von Raab,* 489 U.S. at 677, 109 S.Ct. at 1397. Interpreting that language, the District of Columbia Circuit

in *Harmon v. Thornburgh*, 878 F.2d at 491, in which the Department of Justice had set out to randomly test, *inter alia*, employees with top secret security clearances, stated, "Whatever 'truly sensitive' information includes, we agree that it encompasses top secret national security information." In a later case challenging a plan by the Executive Office of the President to conduct random urinalysis of all employees with both top secret and secret security clearances, that court wrote:

> We do not see ... how the constitutional permissibility of drug testing can depend on whether the employees tested have access to information the disclosure of which causes "only" *serious* damage as opposed to *exceptionally grave* damage to national security.

*Hartness v. Bush*, 919 F.2d at 173. It thus upheld testing of employees with those clearances, noting that *Harmon* allowed testing of employees with top secret clearance *"regardless of any other attendant circumstances"* and "regardless of the fact that some employees may rarely, if ever, be exposed to such materials." *Id.* at 172, 174 (emph. in orig.). Other decisions have similarly upheld random testing of employees with top secret or secret security clearances. *See, e.g., American Federation of Government Employees v. Skinner*, 885 F.2d 884 (D.C.Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1960, 109 L.Ed.2d 321 (1990) (upholding random drug testing for mail van operators with top secret or secret security clearances); *National Federation of Federal Employees v. Cheney*, 742 F.Supp. 1 (D.D.C.1990) (upholding random drug testing for employees of the Defense Mapping Agency—including carpenters and gardeners—with top secret or secret security clearances). *See also National Treasury Employees Union v. Hallett*, 756 F.Supp. 947 (E.D.La.1991) (the *Von Raab* remand, upholding drug testing of applicants for promotion to Customs Service positions requiring access to top secret, secret and confidential material). This court agrees that the government has a compelling interest in keeping top secret and secret classified information from the hands of individuals whose drug abuse might diminish their capacity to manage that access responsibly and with impeccable integrity.

## 2. The Employees' Expectation of Privacy

Counterbalanced against the government's legitimate interests in random drug testing is the employees' legitimate expectation that they be free from invasive searches. Numerous factors bear on an employee's objective expectation of privacy vis-a-vis urinalysis, including the demands of the position they occupy, other intrusions to which they are subject, and the characteristics of the search, including notice, scope, and method.

Courts have held that employees in positions similar to the Customs Service testing-designated positions have lowered expectations of privacy by virtue of their duties. This includes employees involved in drug interdiction. *Von Raab*, 489 U.S. at 672, 109 S.Ct. at 1394 ("We think Customs employees who are directly involved in the interdiction of illegal drugs ... have a diminished expectation of privacy in respect to the intrusions occasioned by a urine test."). *See also Harmon v. Thornburgh*, 878 F.2d at 490 (properly defined class of drug prosecutors could be tested); *National Federation of Federal Employees v. Cheney*, 884 F.2d at 614 (army drug counsellors "should reasonably expect to provide extraordinary assurances of trustworthiness and probity"). It also includes employees who carry a firearm, *Von Raab*, 489 U.S. at 672, 109 S.Ct. at 1394 (employees required to carry firearms have a "diminished expectation of privacy" and "cannot reasonably expect to keep from the Service personal information that bears directly on their fitness"); *Penny v. Kennedy*, 915 F.2d at 1067; *Taylor v. O'Grady*, 888 F.2d at 1196, and who operate dangerous instrumentalities such as trains, *Skinner*, 489 U.S. at 628, 109 S.Ct. at 1419 ("logic and history show that a diminished expectation of privacy attaches to information relating to the physical condition of covered [railroad] employees"), and automobiles. *Plane v. United States*, 750 F.Supp. at 1370 ("I am convinced that [a

motor vehicle operator] who accepts a job 'fraught with such dangers' has a lessened expectation of privacy as to his or her ability to perform his or her job requirements free from the influence of illegal drugs."); *American Federation of Government Employees v. Sullivan*, 744 F.Supp. at 301 ("[G]iven the safety-related nature of their work, motor vehicle operators may have some diminished expectations of privacy."). It also includes employees who handle "sensitive information." *Von Raab*, 489 U.S. at 677, 109 S.Ct. at 1397 (employees who handle sensitive information, as well as undergo probing background checks, have diminished expectation of privacy with respect to urinalysis).

■ In addition, an employee's subjection to a detailed investigation and background check as a condition of employment also lessens his expectation of privacy. This applies to checks into an employee's criminal, employment, and educational background, *Von Raab*, 489 U.S. at 677, 109 S.Ct. at 1397; *National Federation of Federal Employees v. Cheney*, 884 F.2d at 612–13; *Thomson v. Marsh*, 884 F.2d 113, 115 (4th Cir.1989), as well as to medical history disclosures and physical examinations. *Skinner*, 489 U.S. at 626–27, 109 S.Ct. at 1417–18; *National Federation of Federal Employees v. Cheney*, 884 F.2d at 613; *Thomson v. Marsh*, 884 F.2d at 115.

The invasiveness of a drug testing plan can be mitigated by a number of other factors. One such factor is notice: "[T]he provision of advance notice ... contribute[s] significantly to diminish the program's intrusion on privacy." *Von Raab*, 489 U.S. at 676 n. 4, 109 S.Ct. at 1396 n. 4. It does so in part by removing the element of surprise, *id.* at 672 n. 2, 109 S.Ct. at 1394 n. 2, and by "reducing to a minimum any 'unsettling show of authority.'" *Id., quoting Delaware v. Prouse*, 440 U.S. 648, 657, 99 S.Ct. 1391, 1398, 59 L.Ed.2d 660 (1979). Plaintiff argues that because many years might pass before an employee is tested the element of surprise remains. Plaintiff's Memo. in Support of its Motion for Summary Judgment, at 20. The court

finds this contention unpersuasive, as every employee is carefully notified that the program is in effect, that his position has been designated for testing, and that a test can be announced at any time. He may also be subject to reminder as his coworkers are selected for testing. The evil of a surprise search derives from the uncertainty of its legitimacy, ignorance of its potential scope or duration, and its often unexplained suggestion of suspicion. No such uncertainties afflict the testing-selected employee. His only "surprise" can be that he has been selected for testing against fairly favorable odds.

The conditions of the test can minimize intrusiveness as well. Thus, the fact that there is no direct observation of the passing of urine by test personnel has been regarded as mitigating intrusiveness. *Von Raab*, 489 U.S. at 672 n. 2, 109 S.Ct. at 1394 n. 2; *Taylor v. O'Grady*, 888 F.2d at 1198. The Supreme Court also found the facts that the urine samples could be tested only for illegal drugs, that the test employed by the Customs Service is highly accurate, and that an employee need not disclose personal medical information unless a test is positive, and then only to a licensed physician, all served to minimize the intrusiveness of the Customs Service testing program. *Von Raab*, 489 U.S. at 672 n. 2, 109 S.Ct. at 1394 n. 2.

### 3. *The Balance*

As earlier, our starting point in balancing the government's interest in drug testing against the employees' expectations of privacy is the Supreme Court's decision in *Von Raab*, in which it found reasonable drug testing of individuals seeking promotion to designated Customs Service positions. *Von Raab* found that the government's interest in testing employees seeking promotion to jobs involved in drug interdiction or which require incumbents to carry firearms outweighed the applicant's privacy interest and upheld the tests to the extent based on those government interests.

In the process, the court rejected the argument that testing is unjustified be-

cause it was not responding to an identified drug problem among Customs Service applicants or employees. The Court observed that "[t]here is little reason to believe that American workplaces are immune" from drug abuse. In addition, it reasoned, drug abuse may be difficult to detect without direct testing. *Von Raab*, 489 U.S. at 674, 109 S.Ct. at 1395. It added that "the almost unique mission of the Service gives the Government a compelling interest in ensuring that many of these covered employees do not use drugs even off duty, for such use creates risks of bribery and blackmail against which the Government is entitled to guard." As the possible harm sought to be avoided is substantial, "the need to prevent its occurrence furnishes an ample justification for reasonable searches calculated to advance the Government's goal." *Id.* at 675, 109 S.Ct. at 1395.

This court finds unpersuasive plaintiff's contention that the privacy interests raised by random testing of incumbents are of such greater import as to render the conclusions reached by the Supreme Court in *Von Raab* inapplicable to the present case. One notable example in which similarly different privacy interests drove a court to uphold testing for applicants but reject it for incumbents is that of federal antitrust prosecutors. In *Harmon v. Thornburgh*, 878 F.2d at 490–91, the District of Columbia Circuit rejected random testing for all federal prosecutors, including specifically antitrust prosecutors, on the ground that no sufficient nexus exists between the nature of their duties and the feared violation. That same court, however, later upheld the testing of applicants for the same position, concluding in *Willner v. Thornburgh*, 928 F.2d 1185, 1193 (D.C.Cir.1991), that the privacy interests of applicants to the position of antitrust prosecutor with respect to the Justice Department's urinalysis program "are significantly diminished and are far less than those of incumbents." That court also found that the government had an interest uniquely applicable to the testing of applicants: an employer may monitor an incumbent's performance, whereas the continuous observation of an applicant is impractical. *Id.* at 1193–94.

However, the case at bar presents a much different distribution of balancing factors. Here there exists a highly compelling nexus between the government's interest in drug testing employees involved in drug interdiction and who carry firearms or operate dangerous vehicles and the feared harm of drug abuse. Drug abuse by certain Customs Service employees may impair their fitness for duty in a hazardous workplace or erode their allegiance to the mission they were hired to perform. It can cause a shifting of sympathy from the public's interest in eliminating illegal drugs to the trade which supplies their need. It can present strong temptation to employees who serve as custodians for contraband. Likewise it can tempt abusers who in the performance of their duties have access to both smugglers and drugs themselves as they search and interdict conveyances, packages and persons. And it can cause direct and immediate damage by impairing an employee's fitness to operate a motor vehicle or forklift.

Given that the Customs Service random testing plan utilizes the HHS Guidelines and other intrusion-minimizing procedures, the admittedly increased expectation of privacy held by incumbents over applicants does not, in this court's view, so appreciably alter the balance arrived at in *Von Raab* that it mandates a departure from its result. The fact that the testing in that case was of applicants for promotion to sensitive positions rather than incumbents in those positions was not identified by the Court as factor of overriding significance in its analysis. *Von Raab*, 489 U.S. at 672 n. 2, 109 S.Ct. at 1394 n. 2. *See also Harmon v. Thornburgh*, 878 F.2d at 489 ("Certainly the random nature of the ... testing plan is a *relevant* consideration; and, in a particularly close case, it is possible that this factor would tip the scales."). One court has gone so far as to find a random, once-per-year, all-employee testing regime to be without a "significant difference" from the testing in *Von Raab* and *Skinner*, since it was "systematic and comprehensive." *Taylor v. O'Grady*, 888 F.2d at 1198. That court also observed that the

random nature of a plan may minimize its intrusiveness by eliminating any discretion from the selection process which would suggest suspicion. *Id.*

Reasonableness is also to be measured in relation to the gravity of the harm sought to.be avoided. The harm which can flow from the use of a firearm by a drug impaired Customs Inspector, both by the misuse of the weapon or the Inspector's failure to neutralize an impending harm, threatens both human life and the success of the Customs Service interdiction mission. There will be little opportunity for another employee to intervene and mitigate the damage an impaired employee in a deadly crisis can cause. Moreover, to the extent drug abuse may undermine an employee's commitment to the effective performance of his duties, the result may be additional drugs flowing across our borders.

Another factor which may have significance to a determination of reasonableness is the degree to which alternative means of achieving the same end are available. Plaintiffs argue that the fact that some of the employees in the Customs Service's testing-designated positions work in supervised conditions in which drug use could be detected by superiors renders unnecessarily intrusive random testing. While this factor has been given consideration in some cases, *see, e.g., National Federation of Federal Employees v. Cheney,* 884 F.2d at 614 (lab technicians "work in a more traditional office environment than the other employees we have considered, such that drug use might be more easily detected"), it is not of great significance as to Customs Service employees when measured against the interests of the government in this case. *See, e.g., Harmon v. Thornburgh,* 878 F.2d at 489 (while Justice Department employees are more closely supervised than the personnel tested in *Von Raab,* "the *Von Raab* Court gave no indication that it deemed this factor to be one of overriding significance."); *Hartness v. Bush,* 919 F.2d at 174 ("the closeness of supervision is nondispositive" in context where employee's access to top secret material is a government interest of overriding significance).

The availability and implementation of other means of detecting and controlling drug abuse by Customs Service employees in sensitive positions does not, in this court's view, significantly diminish the government's interest in random testing. It may be difficult or impossible to detect drug abuse by observation in the workplace before a mishap or a breach of integrity occurs. Post accident testing has a random element to it, and may likewise deter, but the possibility of testing is less certain and it occurs only after harm to life, property, or the Customs Service mission has taken place. Voluntary programs for testing and control help only those who already know they may have a problem; it does not reach the more dangerous user who denies and actively conceals his problem. Random testing fills an important gap in the agency's efforts to detect and deter drug use, and is quite reasonable provided the employee's duties are sufficiently sensitive.

■ It thus remains to apply these balancing principles to the individual positions slated for testing by the Customs Service. Employees who are directly involved in enforcement of drug laws by means of surveillance, investigations, searches and seizures, arrests, intelligence gathering and strategic enforcement planning are the nation's front-line of defense against drug smugglers, and the Service is entitled to assurance that neither their fitness for duty nor their allegiance to the mission has been compromised by drug abuse. The testing-designated positions involved on this level are Customs Inspector, Canine Enforcement Officer, Canine Aircraft Inspector, Customs Mail Specialist, Customs Inspection Assistant, Customs Inspection Clerk, Operations Analyst, Operational Analysis Specialist, Operational Enforcement Analyst, Program Analyst (Inspection and Control) and Security Assistant. Those members of this list with inspection duties may also have direct contact with drug smugglers and illegal contraband. Those positions in the list whose duties are strategic planning of interdiction efforts

are heavily engaged in the collection, interpretation and dissemination of drug trafficking intelligence. They utilize confidential informants and other sources, including the TECS database, to guide the field personnel in detecting and apprehending smugglers. Security Assistants, while they might not have direct contact with smugglers or access to contraband or intelligence, conduct surveillance activities which make them important members of that front-line. Their watchfulness and commitment to their mission may be the only impediment to a smuggler who would otherwise avoid a customs inspection and detection. The Customs Service may reasonably test all incumbents in these positions.

■ Many of the testing-designated positions require access to or the handling of illegal drugs in the possession of the Customs Service, which, creating temptation and hazard, renders random testing reasonable. Those positions are Packer/Opener/Verifier, Sales and Seizure Specialist, Seized Property Custodian, Seized Property Management Specialist, Seized Conveyance Specialist, Secure Storage Technician, Secure Storage Specialist, Secure Storage Custodian, Paralegal Clerk, Paralegal Assistant, and Paralegal Specialist.

■ Forklift Operators and Motor Vehicle Operators also have some access to illegal drugs in the custody of the Customs Service. But the even more compelling government interest in testing these positions flows from the obvious dangers instinct in the operation of instrumentalities which an instantaneous error in judgment could render lethal. This court readily joins the ranks of those courts which recognize the reasonableness of random testing of incumbents in such positions. Specifically, these positions include Forklift Operator, Warehouse Worker (Forklift Operator), Motor Vehicle Operator, and Messenger (Motor Vehicle Operator).

■ Several of the testing-designated positions authorize incumbents to carry firearms. Those are Customs Inspector, Canine Aircraft Inspector, Canine Enforcement Officer, Customs Inspection Assistant, Seized Conveyance Specialist, Secure Storage Technician, Secure Storage Specialist, and Secure Storage Custodian. The fact that not all incumbents are required to carry firearms at all times does not appreciably weaken the government's interest in ensuring that employees whose positions may at some indefinite time require them to use a deadly weapon are not impaired when that time arrives. *See, e.g., Hartness v. Bush*, 919 F.2d at 173–74 (testing of employees with security clearances reasonable even though many are rarely exposed to such materials; testing assures readiness when the need for exposure arises).

■ The balance also favors the testing of Customs Service Chemists. They, like many other incumbents in the Customs Service, have access, often unsupervised, to quantities of illegal drugs. The fact that such quantities may only be small portions of larger shipments interdicted by the Service does not reduce the damage the potential abuse of trust might cause to the integrity of the Service and its mission. The government is entitled to know that those individuals to whom it entrusts quantities of cocaine, heroin or other illegal drugs are persons of unimpeachable probity, and to know that it is not, by virtue of its own procedures, contributing to the very problem its mission is to combat.

The fact that some Chemists specialize in testing non-drug materials does not in the court's view render the category overly broad. All Chemists may, regardless of their specialization, be required to test illegal drugs at any time. Moreover, those Chemists work in the same laboratory where illegal drugs are tested, such that access by a determined Chemist is not unforeseeable. In these respects this group is not unlike the group of chemists in *Thomson v. Marsh* who worked in a chemical weapons plant but had no current contact with toxic substances. The court found that although plaintiff's experiments "do not at present involve chemical warfare agents, ... she is a member of a group of ... scientists who may be called on at any time to participate in such experiments." The court upheld random drug

testing. *Thomson v. Marsh*, 884 F.2d at 115.

■ It follows from this analysis that the student trainees who perform under supervision the duties of Customs Inspector and Chemist may be drug tested as well. They perform the same duties and are subject to the same background checks as these incumbents. The balance tips even more decidedly in favor of testing of student trainees, however, for several reasons. First, the government's interests in testing are greater because like an applicant a student trainee has had less opportunity to be observed and be evaluated for trustworthiness. Second, as a part-time provisional employee, he may have less allegiance to the Customs Service and its mission. Third, although technically considered an incumbent, as a short-term, part-time provisional employee, student trainees have a lower expectation of privacy than a fully privileged incumbent. Thus, I conclude that the testing of Customs Inspector Student Trainees, Chemist Student Trainees, and General Student Trainees, who assist in compiling data on enforcement workload changes and import patterns, and most of whom have access to sensitive drug interdiction intelligence in the TECS database, is reasonable in light of these factors.

■ Thus, random drug testing of incumbents in all testing-designated positions is reasonable on the basis of the duties those positions entail. In addition, those employees with access to top secret and secret national security information may reasonably be tested on the basis of that access as well. The court finds unpersuasive the contention that the supervision implied by the Customs Service working environments so lessens the government's compelling interest in monitoring the integrity of those with whom it entrusts its most critical secrets that testing is rendered unnecessary. The Louisiana District Court's discussion in the *Von Raab* remand is germane:

> While [supervision] is certainly a factor to be considered, ... it is not dispositive of the matter. Moreover, plaintiffs view the problem associated with drug use by Customs employees too narrowly. Unlike, for example, the transportation industry, the Government's primary concern is not an employee who is impaired on the job, ... but that an employee with access to sensitive information may disclose such information through off duty intoxication, blackmail, or bribery. A traditional office environment will not alleviate such concerns.

*National Treasury Employees Union v. Hallett*, 756 F.Supp. at 953 (citations omitted).

### CONCLUSION

The court thus concludes that the Customs Service random drug testing plan is reasonable as applied to all testing-designated positions in the NTEU bargaining unit. Summary judgment in favor of defendants is granted, and plaintiff's cross motion is, accordingly, denied.

SO ORDERED.