MIDDLEBROOKS v WAYNE COUNTY

Docket Nos. 96078, 96086, 96090. Argued December 3, 1993 (Calendar No. 13). Decided August 23, 1994.

Segrett Middlebrooks brought an action in the Wayne Circuit Court against Wayne County, Maybury Medical Clinics, Inc., and Bioanalytical Procedures, Inc., after being discharged as a permanent general service worker with the county because urinalysis drug screening during a preemployment physical examination yielded positive results. He alleged that the county's requirement that applicants for permanent positions that involve driving heavy equipment near and on public highways must submit to urinalysis testing for controlled substances violated his rights under the Fourth Amendment of the Constitution of the United States and 42 USC 1983 to be free from unreasonable search and seizure. The court, Kathleen MacDonald, J., granted summary disposition for the defendants on the ground that urinalysis testing is permitted under the Search and Seizure Clause of the constitution where the position involves the operation of heavy machinery. The Court of Appeals, D. E. HOLBROOK, JR., P.J., and SULLIVAN, J. (TAYLOR, J., concurring in part and dissenting in part), reversed and remanded in an unpublished opinion per curiam, concluding that the urinalysis test was unreasonable as a matter of law (Docket No. 128482). The defendants appeal.

In an opinion by Justice LEVIN, joined by Justices BRICKLEY, RILEY, and GRIFFIN, the Supreme Court held:

The plaintiff had a reduced expectation of privacy in not being subjected to urinalysis drug screening by the government as a result of his application for a position with a governmental agency involving operation of heavy equipment.

1. Federal case law has held that mandatory urinalysis testing is a search under the Fourth Amendment, but that such a search will survive constitutional scrutiny, in the absence of a warrant or individualized suspicion, if the important governmental interest furthered by the intrusion outweighs the privacy interests implicated by the search. Further, privacy expectations of employees are diminished through their participation in an industry that is regulated pervasively to ensure safety, a goal dependent in substantial part on the health and fitness of

covered employees. The cases have been interpreted to permit urinalysis testing of applicants for positions that involve duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences.

2. Pursuant to the holdings of the federal cases, the dismissal of the plaintiff's claims under the Search and Seizure Clause of the Fourth Amendment and § 1983 was appropriate. Operation of equipment such as a riding lawn mower, especially on highway medians and embankments, and driving front-end loaders, trucks, and other equipment between a work site and repair facility, might result in serious injury from momentary lapses of attention characteristic of illegal drug use. The plaintiff had a reduced expectation of privacy in not being subjected to urinalysis drug screening by the government as a result of his application for a position with a governmental agency as a laborer. The balance mandated by the Fourth Amendment tips in favor of permitting the state to require urinalysis testing for such positions.

3. There was no evidence that Wayne County failed to provide notice to applicants that urinalysis testing would be included in its physical examination, that applicants for positions were arbitrarily selected for urinalysis testing, or that information from urinalysis testing was used for purposes other than determining the suitability of applicants for general service-worker positions. Nor was there evidence that Maybury Medical unduly intruded on the privacy of applicants in collecting urine samples, that Bioanalytical Procedures employed unreliable or biased methods in analyzing urine samples, or that candidates were not given the opportunity to contest the results or submit their urine to physicians of their own choosing. In the absence of evidence suggesting such procedural inadequacies, the urinalysis testing administered to the plaintiff in connection with his application for a permanent position with a governmental agency was not violative of the Fourth Amendment.

Justice BOYLE, joined by Chief Justice CAVANAGH and Justice MALLETT, concurring, stated that when the government does not have any reason to suspect drug use by a person, it may only impose drug tests in the absence of a quantum of individual suspicion when such a requirement would jeopardize an important governmental interest. In this case, a requirement of individual suspicion would jeopardize an important governmental interest because the plaintiff has not previously held the position for which he applied, and thus the county has not been

able to scrutinize his performance of those duties for signs that he could not perform them safely.

Reversed.

*James Schuster* for the plaintiff.

*Saul A. Green,* Corporation Counsel, and *Ellen E. Mason,* Assistant Corporation Counsel, for defendant Wayne County.

*Law Offices of Schwartz & Jalkanen* (by *Melvin Schwartz* and *Anne Loridas Randall)* for defendant Maybury Medical Clinics, Inc.

*Zamplas, Nystrom, Johnson & Cavanagh, P.C.* (by *Christine Marakas Battle),* for defendants Bioanalytical Procedures, Inc., and Perry Health Net Laboratory Services.

Amici Curiae:

*Bodman, Longley & Dahling* (by *Jerold Lax* and *Karen L. Piper)* for Michigan Municipal League, Michigan Townships Association, Michigan Association of Counties, and County Road Association of Michigan.

LEVIN, J. The question presented is whether a person who applies to Wayne County for a permanent position that involves driving heavy equipment near and on public highways[1] may, consistent with the Search and Seizure Clauses of the

---

[1] The circuit court granted summary disposition for Wayne County, Maybury Medical Clinics, Inc., and Bioanalytical Procedures, Inc., on the ground that urinalysis testing was permitted under the Search and Seizure Clause of the United States Constitution where, as here, the position involves the operation of heavy machinery. The Court of Appeals reversed and remanded on the grounds that the permanent position did not involve an unusual degree of danger or a risk that was significant or special, and that the interest in urinalysis testing was not sufficient to overcome Middlebrooks' privacy expectations.

state and federal constitutions, be required to submit to urinalysis testing.

The permanent position involves operation of heavy equipment that might result in serious injury from even a "momentary lapse of attention" characteristic of illegal drug use.[2]

We find that, as a result of his application for such a position with a governmental agency, Middlebrooks had a reduced expectation of privacy in not being subjected to urinalysis drug screening by the government.

We conclude that urinalysis testing in connection with an application for this permanent position with a governmental agency is not violative of the Search and Seizure Clause, and reverse the decision of the Court of Appeals.

I

Segrett Middlebrooks was a seasonal service worker with Wayne County from May, 1984, until November, 1984.[3] Middlebrooks applied in October, 1984, for a permanent position as a general service worker or laborer. The tasks he would perform as a permanent employee would be the same as those he performed as a seasonal employee, including:

- operation of saws, wood chippers (used to grind brush into wood chips), and a front-end loader on Wayne County Road Commission premises;
- operation of a riding lawn mower on highway medians and embankments;

---

[2] *Skinner v Railway Labor Executives' Ass'n,* 489 US 602, 628; 109 S Ct 1402; 103 L Ed 2d 639 (1989).

[3] A "seasonal position," according to Wayne County regulations, includes "duties and responsibilities of such nature that their performance is discontinued and the position left vacant during a part of the year," with the vacancy typically occurring "during the same period of each year."

- driving trucks, including dump trucks car-
  rying equipment and stake trucks and other
  equipment, from work sites to repair facili-
  ties used by the road commission.

Middlebrooks submitted to a preemployment
physical on November 1, 1984, conducted by May-
bury Medical, which included urinalysis testing for
controlled substances.[4] The urinalysis test was
"positive for opiates and cocaine," and it was
determined that he was "[n]ot qualified for the
position sought."

Middlebrooks had completed and signed a "Con-
sent Form and Questionnaire" that indicated he
had not taken any prescription medication within
the past month or any nonprescription medication
within the last ninety-six hours, and which pro-
vided that he "understand[s] that the results of
this examination will be reported to the agency
that referred me for the tests."

Middlebrooks had also signed a "Medical Exami-
nation" form that indicated he was not "taking
any medication at the present time." He acknowl-
edged a "habit" of tobacco,[5] and did "certify that
the above information is true and agree and un-
derstand any misstatement of material facts con-
tained in this form may cause forfeiture of all my
rights to employment with the County of Wayne."

Middlebrooks began performing the tasks of a
permanent general service worker on November 9,
1984, as a "provisional employee[ ] subject to pass-
ing the physical including the drug screen, and
subject to later passing a civil service examina-

---

[4] Maybury Medical conducted employment physicals for Wayne
County. Maybury Medical contracted with Bioanalytical Procedures
for analysis of urine samples. The name of Bioanalytical Procedures
was changed in 1986 to Perry Health Net Laboratory.

[5] Middlebrooks left blank lines inquiring whether he had "habits"
of "alcoholic beverages" or "drugs."

tion." He was discharged on November 20, 1984, for failure to pass a physical examination.[6]

II

Middlebrooks commenced this action[7] against

[6] Middlebrooks submitted a letter on December 12, 1984, from a physician "to certify that [Middlebrooks'] research lab findings are nondrug content in blood, except for quinine." The next day, Middlebrooks requested permission to undergo another urinalysis test.

A physician at Maybury Medical sent a letter dated January 8, 1985, to the Deputy Director of Personnel and Human Resources for Wayne County, stating that he was "unable to recommend this applicant for reconsideration for employment in the Wayne County Road Commission," on the basis of positive results for opiates and cocaine and Middlebrooks' answers to the "consent form and questionnaire." The physician found the presence of quinine in Middlebrooks' blood to be "highly suspicious of substance abuse":

Quinine is used medicinally in the treatment of malaria, and in the treatment of intermittent claudication and muscle cramps. When it is detected in the bloodstream some time after a urine analysis has detected opiates *and* cocaine, it is highly suspicious of substance abuse, yet we are not qualified to make that a definite assumption. However, there is no medical history evident here to substantiate even the finding of quinine.

In the opinion of this office, the positive finding of cocaine is not acceptable. It is possibly used as anesthetic in some eye surgery, but that kind of history is absent in this regard.

Middlebrooks testified on deposition that he recalled taking quinine during the period between the physical examination at Maybury Medical and the physical examination at the office of the physician who wrote the December 12 letter. He said that he obtained the quinine from his grandmother to relieve leg cramps.

Middlebrooks was informed by letter on January 24, 1985, that, on the basis of the recommendation from Maybury Medical, "the previous determination that you were disqualified for employment is affirmed."

[7] Middlebrooks filed a complaint against Wayne County with the Equal Employment Opportunity Commission and the Michigan Department of Civil Rights, alleging race discrimination in its refusal to retest Middlebrooks and termination of his employment. The EEOC found that "[e]xamination of the evidence indicates that there is no reasonable cause to believe that this allegation is true."

Four other persons who had been discharged from employment with Wayne County "due to failure of medical examinations" were subsequently deemed " 'qualified for position sought' " without retesting after "[l]egitimate reasons for the presence of certain substances

Wayne County, Maybury Medical, and Bioanalytical Procedures, alleging violations of his rights, under the Fourth Amendment and 42 USC 1983, to be free from unreasonable search and seizure, and of due process of law, both substantive and procedural, and privacy, along with violations of analogous rights under the Michigan Constitution. Middlebrooks also claimed violations of the Vocational Rehabilitation Act,[8] the Handicappers' Civil Rights Act,[9] the Civil Rights Act,[10] and breach of an implied contract, negligence, and violation of common-law privacy.

The circuit court granted summary disposition for Wayne County, Maybury Medical, and Bioanalytical Procedures on all counts, on the ground that urinalysis testing is permitted under the Fourth Amendment where the position involves the operation of heavy machinery.[11]

The Court of Appeals reversed on Middlebrooks' § 1983 and Fourth Amendment claims against Wayne County, and remanded the case to deter-

in the urinalysis tests were given by competent physicians at Maybury Medical Clinic." Of these four persons, two were black, and one was a black seasonal employee.

[8] 29 USC 701 et seq.

[9] MCL 37.1101 et seq.; MSA 3.550(101) et seq.

[10] MCL 37.2101 et seq.; MSA 3.548(101) et seq.

[11] Skinner, n 2 supra; Nat'l Treasury Employees Union v Von Raab, 489 US 656; 109 S Ct 1384; 103 L Ed 2d 685 (1989).

The circuit court rejected the due process claim under the Michigan Constitution because Middlebrooks was given notice that a drug test was part of the physical examination, signed a consent form for the drug test, was given the opportunity to challenge the positive results before Wayne County's Personnel Department, received a hearing before the EEOC, where it was suggested that he could reapply for the position at the following examination, and was given the opportunity to provide a report from his own physician.

The circuit court rejected the right to privacy claim based on Middlebrooks' consent to the urinalysis test, the Civil Rights Act claim because two of the four persons who had successfully challenged the urinalysis test had been black, and the Michigan Handicappers' Civil Rights Act claim because drug addiction is not unrelated to a job involving operation of heavy machinery.

mine whether Middlebrooks stated a § 1983 claim against Maybury Medical and Bioanalytical Procedures, and to determine Middlebrooks' damages. The Court of Appeals ruled that "Wayne County failed to establish that its interest was sufficient to overcome plaintiff's privacy expectations," and concluded that the urinalysis test was unreasonable as a matter of law.[12] The permanent position did not involve "any unusual degree of danger" or a risk that was "significant or . . . special." Middlebrooks would not have been required to carry passengers or security-sensitive materials,[13] or to operate heavy equipment involving great risk of harm to others.[14] General laborers are not "traditionally highly regulated."[15]

This Court granted leave to appeal "limited to whether the Court of Appeals correctly determined

[12] Unpublished opinion per curiam, issued November 9, 1992 (Docket No. 128482). See *Von Raab*, n 11 *supra*.

[13] *American Federation of Government Employees, AFL-CIO v Sullivan*, 787 F Supp 255, 257 (D DC, 1992).

[14] *Plane v United States*, 750 F Supp 1358 (WD Mich, 1990). The court of appeals found that the permanent position resembled the job of transit authority "maintenance custodian" involved in *Bolden v Southeastern Pennsylvania Transportation Authority*, 953 F2d 807, 823 (CA 3, 1991), in which the United States Court of Appeals for the Third Circuit ruled did not warrant urinalysis testing.

[15] The Court of Appeals affirmed the circuit court's dismissal of Middlebrooks' claims of due process violations under the Michigan Constitution ("He had a right to be considered for such employment in a fair, reasonable, and nondiscriminatory manner. That right was met. Having failed to show a protectible liberty or property interest, plaintiff cannot sustain a substantive due process claim"); violations of the Handicappers' Civil Rights Act ("drug addiction is related to an employee's ability to perform the job of general laborer for the Wayne County Road Commission. Drug addiction was not, therefore, a handicap within the meaning of the statute as it then was written"); and common-law invasion of privacy ("Plaintiff has not alleged any injury or claimed any relief on his claim for common-law invasion of privacy that differs from his claims for violation of his Fourth Amendment rights").

The Court of Appeals did not address Middlebrooks' claims under the Civil Rights Act, or his claims for breach of implied contract or negligence because Middlebrooks did not, on appeal, contest dismissal of those counts.

that the urinalysis drug testing was unconstitutional as a matter of law."[16]

### III

The United States Supreme Court ruled in *Skinner v Railway Labor Executives' Ass'n*[17] that mandatory urinalysis testing is a search under the Fourth Amendment,[18] but that such a search will survive constitutional scrutiny, in the absence of a warrant or individualized suspicion, if the "important governmental interest furthered by the intrusion" outweighs the "privacy interests implicated by the search . . . ."[19]

The Court upheld Federal Railroad Administration regulations providing for mandatory urinalysis testing of railroad employees, without warrants or individualized suspicion, when the employee was involved in a train accident, or violation of

[16] 444 Mich 858 (1993).

[17] 489 US 602; 109 S Ct 1402; 103 L Ed 2d 639 (1989).

[18] The United States Supreme Court said:

> Nor can it be disputed that the process of collecting the sample to be tested, which may in some cases involve visual or aural monitoring of the act of urination, itself implicates privacy interests. As the Court of Appeals for the Fifth Circuit has stated:
>
> "There are few activities in our society more personal or private than the passing of urine. Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom" *Nat'l Treasury Employees Union v Von Raab*, 816 F2d 170, 175 [CA 5, 1987].
>
> Because it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable, the Federal Courts of Appeals have concluded unanimously, and we agree, that these intrusions must be deemed searches under the Fourth Amendment. [*Skinner, supra*, p 617.]

[19] *Skinner, supra*, p 624.

certain safety rules. The Court said that the governmental interest was "compelling":

> Employees subject to the tests discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences. Much like persons who have routine access to dangerous nuclear power facilities, employees who are subject to testing under the FRA regulations can cause great human loss before any signs of impairment become noticeable to supervisors or others.[20] [Citations omitted.]

The Court also said that the privacy expectations of employees were "diminished" through "their participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees."[21] The reason for the pervasive regulation is "obvious": "An idle locomotive, sitting in the roundhouse, is harmless. It becomes lethal when operated negligently by persons who are under the influence of alcohol or drugs."[22]

In *Nat'l Treasury Employees Union v Von Raab*,[23] decided the same day as *Skinner*, the Court employed the balancing analysis announced in *Skinner* to affirm the validity, under the Fourth Amendment, of United States Customs Service regulations requiring urinalysis testing of employees seeking transfer or promotion to positions involving drug interdiction or the carrying of firearms. The Court said that it

agree[d] with the Government that the public

---

[20] *Id.*, p 628.

[21] *Id.*, p 627.

[22] *Id.*, p 628, quoting *Railway Labor Executives' Ass'n v Burnley*, 839 F2d 575, 593 (CA 9, 1988) (Alarcon, J., dissenting).

[23] 489 US 656; 109 S Ct 1384; 103 L Ed 2d 685 (1989).

should not bear the risk that employees who may
suffer from impaired perception and judgment will
be promoted to positions where they may need to.
employ deadly force.[24]

United States district and circuit courts of ap-
peals interpreting *Skinner* and *Von Raab* have
generally held that positions that require opera-
tion of heavy machinery or motor vehicles involve
"duties fraught with such risks of injury to others
that even a momentary lapse of attention can
have disastrous consequences."[25] Other federal
courts have suggested that positions that require
operation of motor vehicles would not be "fraught
with such risks of injury to others" under the
rationale of *Skinner* and *Von Raab* where the risk

---

[24] Note 11 *supra*, pp 670-671.

[25] *Skinner, supra*, p 628. *Plane v United States*, n 14 *supra*, p 1370,
later proceeding 796 F Supp 1070, 1075-1078 (WD Mich, 1992), up-
holding random testing of heavy machinery operators and motor
vehicle operators because "a single lapse may cause serious injury or
death. Clearly, alertness and diligence are required of all drivers.
And, I am convinced that an employee who accepts a job 'fraught
with such dangers' has a lessened expectation of privacy as to his or
her ability to perform his or her job requirements free from the
influence of illegal drugs." *Nat'l Treasury Employees Union v Hallett,*
776 F Supp 680, 692 (ED NY, 1991), permitting random testing of
forklift operators on grounds that "[t]he threat posed by a lapse of
control or judgment by a drug-impaired forklift operator is so obvious
as to require no elaboration. Suffice to say the threat is both immedi-
ate and severe." See also *American Federation of Government Em-
ployees, AFL-CIO v Cavazos*, 721 F Supp 1361, 1373 (D DC, 1989),
aff'd in part and vacated in part (without opinion) *American Federa-
tion of Government Employees, AFL-CIO v Sanders*, 288 US App DC
342; 926 F2d 1215 (1991), citing *Harmon v Thornburgh*, 278 US App
DC 382, 389; 878 F2d 484 (1989) ("[A]ll of the motor vehicle operators
will come into direct contact with other drivers and pedestrians and
are therefore in a position where 'even a momentary lapse of atten-
tion' could result in harm." Citations omitted.); *Nat'l Treasury Em-
ployees Union v Yeutter*, 733 F Supp 403, 414 (D DC, 1990), aff'd 287
US App DC 28, 31-32; 918 F2d 968 (1990), citing *American Federation
of Government Employees, AFL-CIO v Skinner*, 280 US App DC 262,
270; 885 F2d 884 (1989) (" '[E]mployees who must travel in USDA
shuttle buses or automobiles in order to perform their essential
duties, should not bear the risk that employees who may suffer from
impaired perception and judgment . . . will be behind the wheel in a
position to cause catastrophic and irremediable harm' ").

is no greater than the risk of "even a momentary lapse of attention" by a citizen operating a motor vehicle.[26]

*Skinner* and *Von Raab* have also been interpreted to permit urinalysis testing of applicants for positions that involve "duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences."[27]

IV

Pursuant to the analysis of the federal cases interpreting *Skinner* and *Von Raab,* we conclude

[26] *American Federation of Government Employees, AFL-CIO v Sullivan,* 744 F Supp 294, 301 (D DC, 1990), later proceeding n 13 *supra,* p 257, citing *Nat'l Treasury Employees Union v Yeutter,* 287 US App DC 28; 918 F2d 968 (1990), enjoining random testing of motor vehicle operators who do not carry passengers where "[t]he government's interest here is the safety risk that an impaired government driver might pose to other drivers on the road. While not insubstantial, this is obviously no different than the interest the public and the government have in keeping any potentially impaired driver off the road. If this is a sufficient 'special government need[]' to permit warrantless searches under *Von Raab,* then the federal government could proceed to test any and all drivers on the road." (Citations omitted.) *Nat'l Treasury Employees Union v Watkins,* 722 F Supp 766, 769-770 (D DC, 1989), also enjoining proposed random testing of motor vehicle operators, assigned to transport documents and passengers, because "the safety risks involved with the motor vehicle operators carrying out their duties are no greater than the normal risks associated with vehicle use by the general public. . . . Defendant has not demonstrated that these employees pose the imminent risk of 'disastrous consequences' that supported the government's interest in *Skinner* and *Von Raab.*"

[27] *Willner v Thornburgh,* 289 US App DC 93, 98; 928 F2d 1185 (1991) ("[I]t is significant that the individual has a large measure of control over whether he or she will be subject to urine testing. No one is compelled to seek a job [as an attorney] at the Department of Justice. . . . If individuals view drug testing as an indignity to be avoided, they need only refrain from applying"); *Int'l Brotherhood of Teamsters v Dep't of Transportation,* 932 F2d 1292, 1307 (CA 9, 1991) ("The level of intrusion, furthermore, is less than that encountered in random testing. No element of surprise is involved. The test is triggered by the [commercial driver] job applicant's own voluntary conduct [in entering the profession that already requires periodic extensive physical examinations and urinalysis], and will occur only once in the applicant's career").

that dismissal of Middlebrooks' claims under the Search and Seizure Clause of the Fourth Amendment and § 1983 was appropriate. Operation of a riding lawn mower, especially on highway medians and embankments, and driving front-end loaders, trucks, and other equipment between a work site and repair facility, might result in serious injury from "momentary lapse[s] of attention" characteristic of illegal drug use.[28] Middlebrooks had a reduced expectation of privacy in not being subjected to urinalysis drug screening by the government as a result of his application for a position with a governmental agency as a laborer,[29] in which potentially serious accidents might result from collision's between a mower, being operated on a median or embankment, and vehicles on the highway, often traveling at high rates of speed.[30] A riding lawn mower, front-end loader, or truck might become "lethal" when "operated negligently."[31] Thus, we conclude that the balance mandated by the Fourth Amendment tips in favor of permitting the state to require urinalysis testing of Middlebrooks although the general service-worker position that he sought is not "regulated pervasively" like that of a railroad employee,[32] or commercial driver.[33]

[28] *Plane*, n 14 *supra*, p 1370; *Hallett*, n 25 *supra*, p 692.

[29] *Plane*, n 25 *supra*, p 1078 ("[W]hile the heavy equipment operators are not required to undergo physicals, they are expected to be physically fit enough to handle the job requirements, including lifting up to seventy to one hundred pound items. Certainly, employees subject to such physical strength requirements could expect that their health may become the subject of inquiry. If that is the case, then they have a reduced expectation of privacy regarding information about their health, and plaintiffs argument has no basis in fact").

[30] *Willner*, n 27 *supra*, p 1190; *Int'l Brotherhood of Teamsters*, n 27 *supra*, p 1307.

[31] *Skinner*, *supra*, p 628, quoting *Railway Labor Executives' Ass'n*, n 22 *supra*, p 593.

[32] *Skinner*, *supra*, p 627.

[33] *Int'l Brotherhood of Teamsters*, n 27 *supra*, p 1307.

This case is distinguishable from *American Federation · of Government Employees, AFL-CIO v Sullivan*[34] and *Nat'l Treasury Employees v Watkins.*[35] Unlike the employees in those cases, who drove cars and vans to transport documents and, in *Watkins,* passengers as well, similar to the way ordinary citizens would use the roads, Middlebrooks would have been required to operate a riding lawn mower on highway medians and embankments, and front-end loaders, trucks, and other heavy equipment from a work site to different facilities of the Road Commission. The specialized duties that Middlebrooks would have performed cannot be analogized to "vehicle use by the general public." The operation of lawn mowers and other mechanical equipment on and near roads designed primarily for cars, vans, and trucks poses a greater threat to traffic safety than the operation of ordinary automobiles, vans, and trucks.[36]

V

There is no evidence that Wayne County failed to provide notice to applicants that urinalysis testing would be included in the physical examination, that applicants for positions were arbitrarily selected for urinalysis testing, or that information from urinalysis testing was used for purposes other than determining the suitability of appli-

[34] 787 F Supp 255, 257 (D DC, 1992).

[35] 722 F Supp 766, 769-770 (D DC, 1989).

[36] Even if this Court were to follow the "interest" of the court expressed in the first *Sullivan* opinion, n 26 *supra*, p 301, to remove employees whose tasks involve "little driving" from the scope of random urinalysis testing, the record here suggests that the driving of mechanical equipment represents a significant component of the position that Middlebrooks sought, and the operation of saws and wood chippers may itself be so potentially dangerous as to warrant urinalysis testing under the rationale of *Skinner* and *Von Raab.*

cants for Wayne County general service-worker positions. Nor is there evidence that Maybury Medical unduly intruded on the privacy of applicants in collecting urine samples, that Bioanalytical Procedures employed unreliable or biased methods in analyzing urine samples, or that candidates were not given the opportunity to contest the results or submit their urine to physicians of their own choosing.

In the absence of evidence suggesting such procedural inadequacies, which might suggest due process concerns with Wayne County's urinalysis testing policy that were flagged in *Von Raab*[37] and *Skinner*,[38] we interpret *Skinner* and *Von Raab* in light of the federal cases, and hold that the urinalysis testing administered to Middlebrooks in connection with his application for a permanent position with a governmental agency was not violative of the Fourth Amendment.

VI

We turn to a consideration of whether dismissal was properly entered of Middlebrooks' claims under the Michigan Constitution. While "[w]e have, on occasion, construed the Michigan Constitution in a manner which results in greater rights than those given by the federal constitution, and where there is compelling reason, we will undoubtedly do so again,"[39] we are not convinced, in light of Middlebrooks' diminished expectation of privacy in not being subjected to urinalysis drug screening by the government as a result of his application for a position with a governmental agency, that urinaly-

[37] *Von Raab,* n 11 *supra,* p 672, n 2.

[38] *Skinner,* n 2 *supra,* pp 620-626.

[39] *People v Nash,* 418 Mich 196, 214-215; 341 NW2d 439 (1983) (citations omitted).

sis testing of Middlebrooks constituted "a major contraction of citizen protections under our constitution . . . ."[40] On the facts of the present case, we decline the invitation to construe art 1, § 11, and other provisions of the Michigan Constitution relating to personal privacy and due process of law, to provide broader protection against urinalysis testing of operators of vehicles than the Fourth Amendment.[41]

Reversed.

---

[40] *People v Sitz,* 443 Mich 744, 763; 506 NW2d 209 (1993).

[41] Wayne County has not claimed that this Court should decline to reach the Michigan constitutional issue because Middlebrooks did not cross appeal. A cross appeal was not necessary to urge an "alternative ground for affirmance."

It is well established that an appellee who has taken no cross appeal may still urge in support of the judgment in its favor reasons that were rejected by a lower court. *Burns v Rodman,* 342 Mich 410, 414; 70 NW2d 793 (1955), and authorities cited therein. It is true that an appellee that has not sought to cross appeal cannot obtain a decision more favorable than was rendered by the lower tribunal. *McCardel v Smolen,* 404 Mich 89, 94-95; 273 NW2d 3 (1978). Michigan Consolidated Gas Company does not seek to enlarge the scope of the relief granted by the PSC, but merely argues an alternate ground for affirmance that was rejected by the PSC. [*ABATE v Public Service Comm,* 192 Mich App 19, 24; 480 NW2d 585 (1991).]

Plaintiff appellant claims that defendant appellee, having taken no cross appeal, may not urge in support of the judgment in his favor, reasons rejected by the trial court. However, in favor of the contrary proposition, see [ten citations of decisions of this Court omitted]. [*Burns v Rodman,* 342 Mich 410, 414; 70 NW2d 793 (1955).]

Plaintiffs urge that because the trial judge, after holding plaintiffs were not proper parties plaintiff, nonetheless considered the case on the merits and defendants have taken no cross appeal, they may not now, on appeal, question plaintiffs' capacity to sue. [Three citations of decisions of this Court omitted.] These cases hold, directly to the contrary, that an appellee need not take a cross appeal in order to urge, in support of relief afforded him below, reasons other than those adopted by or those rejected by the lower court. [*Menendez v Detroit,* 337 Mich 476, 483; 60 NW2d 319 (1953).]

BRICKLEY, RILEY, and GRIFFIN, JJ., concurred with LEVIN, J.

BOYLE, J. (*concurring*). I agree with the result reached by the majority. I write separately, however, to clarify my view of the application of *Skinner v Railway Labor Executives' Ass'n,* 489 US 602; 109 S Ct 1402; 103 L Ed 2d 639 (1989), and *Nat'l Treasury Employees Union v Von Raab,* 489 US 656; 109 S Ct 1384; 103 L Ed 2d 685 (1989).

I

A

The recent United States Supreme Court opinions concerning Fourth Amendment restrictions on government drug screening, *Skinner* and *Von Raab,* employ balancing tests. But a balancing test is not a theory of how cases ought to be decided. It is only a method of applying such a theory. For that reason, it is helpful to review the theories behind or goals of the balancing tests that are employed.

In both opinions, the Court first "balance[s] the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements . . . ." *Skinner,* 489 US 619; *Von Raab,* 489 US 666-667. The Court held that "a warrant is [not] essential to render the intrusions here at issue reasonable under the Fourth Amendment." *Skinner,* 489 US 624; see also *Von Raab,* 489 US 666-667.

The question thus becomes whether a drug test could be reasonable under the Fourth Amendment in the absence of probable cause or some quantum of suspicion. The Court held that it could.

> In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion. [*Skinner,* 489 US 624.][1]

In *Von Raab,* the Court phrased the same rule in the form of a second balancing test: "the Government's need to conduct suspicionless searches . . . outweighs the privacy interests of employees . . . ." 489 US 668.

The goal of this balancing test, on which the outcome of the case before us hinges, bears repeating: when the government does not have any reason whatsoever to suspect drug use by the individual it is testing, it may only impose drug tests when a requirement of individual suspicion would jeopardize an important governmental interest. In this case, a requirement of individual suspicion would jeopardize an important governmental interest because the plaintiff has not previously held the position for which he applied, and thus the county has not been able to scrutinize his performance of those duties for signs that he could not perform them safely.

B

The majority states that the defendant has an

---

[1] This is the test the majority cites with the following description:

> The United States Supreme Court ruled in *Skinner v Railway Labor Executives' Ass'n* that mandatory urinalysis testing is a search under the Fourth Amendment, but that such a search will survive constitutional scrutiny, in the absence of a warrant or individualized suspicion, if the "important governmental interest furthered by the intrusion" outweighs the "privacy interests implicated by the search . . . ." [*Ante* at 159.]

interest in testing the plaintiff for illegal drug use because "[a] riding lawn mower, front-end loader, or truck might become 'lethal' when 'operated negligently.' " *Ante* at 163. The majority cannot be saying that the Fourth Amendment permits testing the plaintiff without probable cause or individualized suspicion simply because his job would involve driving a lawn mower. The cases cited in the majority opinion demonstrate that this fact alone would be insufficient to justify suspicionless drug testing.

The majority frames the question of reasonableness around whether a worker's job would involve " 'duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences.' " *Ante* at 161. Then it claims that federal courts are divided on the question. *Id.* at 161-162. Authority appears divided, however, only because of the misleading way this question is framed.

Under the great weight of federal authority, there is a clear line between suspicionless testing of motor vehicle operators who carry passengers and suspicionless testing of those who do not. In *American Federation of Government Employees, AFL-CIO v Skinner,* 280 US App DC 262; 885 F2d 884 (1989), the court agreed that "strong safety interests support the testing of most Department motor vehicle operators, who are responsible for, *inter alia,* the transportation of visiting foreign dignitaries and key Department officials and the operation of passenger-laden shuttle buses." *Id.* at 270. It acknowledged, however, that safety considerations alone could not justify testing a "driver whose exclusive duties entail driving a mail van . . . ." *Id.*

The importance of this distinction was reiterated

in *Nat'l Treasury Employees Union v Yeutter,* 287 US App DC 28; 918 F2d 968 (1990) (opinion of Mikva, J., joined by Edwards and Silberman, JJ.). Among the plaintiffs in that case were employees of the Department of Agriculture who primarily chauffeured officials and who drove shuttles only during the lunch hours and sick days of private drivers. The court rejected their attempt to distinguish themselves from the plaintiffs in *American Federation of Government Employees v Skinner, supra,* on the ground that the latter carried many more passengers. Addressing the argument that this result would "open the door to" testing all government employees who drive to work, the court noted a bright line between workers who carry passengers and those who do not: "It is not obvious to us that the government could show a special need, unrelated to law enforcement, to test drivers who do not carry passengers; nor do most drivers have diminished privacy expectations with respect to drug testing." *Id.* at 32.

The principle is stated more directly in *American Federation of Government Employees, AFL-CIO v Sullivan,* 787 F Supp 255, 257 (D DC, 1992):

> The government's interest here is the safety risk that an impaired government driver might pose to other drivers on the road. While not insubstantial, this is obviously no different than the interest the public and the government have in keeping any potentially impaired driver off the road. If this is a sufficient "special government need[ ]" to permit warrantless searches under *Von Raab* [489 US 665], then the federal government could proceed to test any and all drivers on the road.

See also *Nat'l Treasury Employees Union v Watkins,* 722 F Supp 766, 769 (D DC, 1989) (issuing a preliminary injunction against random drug test-

ing of motor vehicle operators in the Department of Energy because "the safety risks involved with the motor vehicle operators carrying out their duties are no greater than the normal risks associated with vehicle use by the general public").

In evaluating whether the plaintiff's drug test violated the Fourth Amendment, the relevant question is not whether riding a lawn mower "can[ ] be analogized to" motor vehicle use by the general public, but whether the government has a more compelling interest in suspicionless drug testing of lawn mower operators. Lacking clear directive from the United States Supreme Court, the answer would seem to hinge upon a comparison of the potential danger. However, the Court is spared from having to decide this case solely on the basis of the questionable empirical assumption that lawn mowers on embankments next to the road pose a greater threat to traffic safety than vehicles on the road, because the plaintiff in this case is an applicant for this position.

C

The majority adds that "Middlebrooks had a reduced expectation of privacy in not being subjected to urinalysis drug screening by the government as a result of his application for a position with a governmental agency as a laborer, in which potentially serious accidents might result . . . ." See *ante* at 163. I agree that this factor is critical but feel that further elaboration is necessary. In *Willner v Thornburgh*, 289 US App DC 93, 98; 928 F2d 1185 (1991), the court elaborated on the difference between testing applicants for employment and testing current employees:

If individuals view drug testing as an indignity

to be avoided, they need only refrain from apply-
ing. This too is an important distinction between
applicants and incumbents. The choice presented
to current employees—undergo random drug test-
ing or lose your job—is not comparable to that
facing applicants. In Judge Friendly's words,
"there is a human difference between losing what
one has and not getting what one wants."

The precise situation at issue here was discussed
in *Nat'l Treasury Employees Union v Watkins,*
*supra,* in which the court enjoined random drug
testing of motor vehicle operators despite the fact
that they also carried guns. The court opined that
"[t]he government would be on surer footing in the
factual setting of . . . a one-time scheduled testing
as a prerequisite for promotion, as [was] at issue
in . . . *Von Raab.*" 722 F Supp 770.

Commentators who oppose drug testing employ-
ees in other circumstances have argued that the
government should be permitted to test applicants.
According to Professor LaFave, the Supreme
Court's decisions support the proposition that sus-
picionless drug testing is permissible under the
Fourth Amendment only when close on the job
supervision plus reasonable suspicion testing do
not provide a sufficient alternative. Consequently,
it may be reasonable to test an employee at the
time of application when it would not be reason-
able to test the same employee once he held the
position:

The point was made earlier that on-the-job ran-
dom or blanket drug testing is unnecessary be-
cause proper supervision of employees plus the
reasonable suspicion test should ordinarily suffice
to turn up those who ought to be tested. But for
beginning employees there has been no prior op-
portunity for such ongoing scrutiny, and thus it is
certainly arguable that testing as a matter of

course is appropriate in such circumstances. [3 LaFave, Search and Seizure (2d ed) (1994 Supp), § 10.3, p 234.]

See also Miller, *Mandatory urinalysis testing and the privacy rights of subject employees: Toward a general rule of legality under the Fourth Amendment,* 48 U Pitt L R 201, 236-237 (1986).

II

In addition, I feel compelled to point out that statements in the majority opinion that do not relate to whether defendant violated plaintiff's rights under the Fourth Amendment to the United States Constitution are dicta. The only issue before this Court is whether the circuit court properly granted summary disposition in favor of Wayne County on plaintiff's claim for damages under 42 USC 1983 for violation of his Fourth Amendment rights.

The plaintiff's complaint is described very specifically by the Court of Appeals:

In count II of his ten-count amended complaint, plaintiff sought damages under 42 USC 1983, claiming that defendants, acting in concert, violated his Fourth Amendment right to be free from unreasonable searches and seizures by searching him without individualized suspicion and with no compelling state interest. In other counts he alleged that defendants violated his right to due process of law, both substantive and procedural, and invaded his constitutionally protected right to privacy. In a separate count, plaintiff claimed that defendants violated his right to due process under the Michigan Constitution. He also claimed violations of the Vocational Rehabilitation Act, 29 USC 701 *et seq.,* and the Handicappers' Civil Rights Act, MCL 37.1101 *et seq.*; MSA 3.550(101) *et seq.,*

alleging discrimination on the basis of false perception of a handicap (drug addiction) and on improper use of a physical examination to refuse employment. [Unpublished opinion per curiam, issued November 9, 1992 (Docket No. 128482), pp 1-2.]

The circuit court granted defendant's motion for summary disposition on all counts. The plaintiff appealed, and the Court of Appeals, in a two to one decision, reversed in part:

In summary, with respect to defendant Wayne County, we reverse the order of the trial court dismissing count II of the amended complaint and affirm the court's dismissal of all other counts. With respect to defendants Maybury Medical Clinics, Inc., Bioanalytical Procedures, Inc., and Perry Health Net Laboratory Services, Inc., we remand for further proceedings with respect to their liability for deprivation of plaintiff's Fourth Amendment rights. We affirm the court's order in all other respects. [*Id.* at 3.]

This Court granted defendants' applications for leave to appeal. See 444 Mich 858 (1993). The plaintiff did not cross appeal.

Nevertheless, the majority finds occasion to address the Michigan Constitution:

On the facts of the present case, we decline the invitation to construe art 1, § 11, and other provisions of the Michigan Constitution relating to personal privacy and due process of law, to provide broader protection against urinalysis testing of operators of vehicles than the Fourth Amendment. [*Ante* at 166.]

It should be perfectly clear that no member of this Court is suggesting that the plaintiff may obtain relief under § 1983 for violation of his state consti-

tutional rights. Section 1983 provides a remedy for violation of federal constitutional and statutory rights. See, e.g., *City of Greenwood v Peacock,* 384 US 808, 829-830; 86 S Ct 1800; 16 L Ed 2d 944 (1966). It does not provide a federal remedy for violation of state rights. See *Smith v Dep't of Public Health,* 428 Mich 540, 612-637; 410 NW2d 749 (1987). The Court of Appeals ruled that, on the facts alleged by the plaintiff, he could obtain relief under § 1983. We could not affirm this ruling on the basis of state constitutional rights because it is not possible to obtain § 1983 relief for violation of state-created rights.

Instead, the majority considers discussion of state constitutional law appropriate on the ground that an appellee who has taken no cross appeal may still urge in support of the judgment in its favor reasons that were rejected by a lower court. *Ante* at 166, n 41. Although I agree with this proposition,[2] I do not think such a situation is presented here. The Michigan Constitution cannot provide an alternative reason why the plaintiff should be allowed to proceed to trial with his § 1983 claim for violation of his Fourth Amendment rights. It forms the basis only for an argument that he should be able to proceed to trial on a (non § 1983) claim that Wayne County violated the Michigan Constitution. In other words, the plaintiff is not advancing grounds for affirmance, but for reversal.

In any event, a mere reference in the plaintiff's brief to the search and seizure provision of the Michigan Constitution does not require us to embark on a discussion of whether damage remedies

---

[2] See, e.g., *Fass v Highland Park (On Rehearing),* 321 Mich 156; 32 NW2d 375 (1948) (considering an argument that a zoning ordinance was unconstitutional as an alternate ground for affirming a trial court order that the defendant city shall not refuse to issue or renew licenses to the plaintiffs).

are available under our constitution, an issue as yet unresolved in our jurisprudence.[3]

On the other hand, the plaintiff does assert an alternate ground for affirmance to the extent he is claiming that his federal due process rights were violated. Cf. *ante* at 165. However, I decline the invitation to advance alternate factual scenarios that "might suggest due process concerns" not articulated by the plaintiff. It seems particularly inappropriate to opine on the future course of federal law when such speculation is unsupported by our own reference to any authority.

III

For the foregoing reasons, I agree with the majority that the decision of the Court of Appeals should be reversed.

CAVANAGH, C.J., and MALLETT, J., concurred with BOYLE, J.

---

[3] *Smith,* four justices agreed to remand to the Court of Claims to determine whether a damage remedy was proper under the Michigan Constitution. 428 Mich 637 (opinion of BOYLE, J.).