COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

JAYME JAY KRATKY,

       Defendant-Appellant.

UNPUBLISHED
October 20, 2015

No.  321754
Grand Traverse Circuit Court
LC No.  14-011761-FH

Before:  BOONSTRA, P.J., and MURPHY and MARKEY, JJ.

PER CURIAM.

Defendant appeals by leave granted the circuit court's order denying his pretrial motion to dismiss the charge of third-degree criminal sexual conduct (CSC III), MCL 750.520d(1)(e) (sexual penetration involving person in school-related position and student aged 16 or 17). We affirm.

In denying defendant's motion to dismiss, the circuit court relied on preliminary examination testimony, the testimony elicited at the evidentiary hearing on defendant's motion to dismiss, and a stipulation regarding basic facts executed by defendant and the prosecutor. Pursuant to the stipulated facts, at the time of the incident giving rise to the charge, defendant was a "private voice tutor," the complainant was a student at a high school within the Traverse City Area Public Schools (TCAPS), and defendant was the complainant's "private voice tutor." Further, as reflected in the stipulation, defendant and the complainant "engaged in sexual penetration on one (1) occasion" during the summer of 2013, the complainant "was 16 years of age when the sexual penetration occurred[,]" and there was "no claim of force or coercion." There was an attachment to the stipulated facts, and the stipulation indicated that the attachment was "a sample of the contract for private voice lessons that was entered into between [d]efendant and [the complainant]." The testimony at the preliminary examination and the hearing on the motion to dismiss indisputably established that defendant tutored students in TCAPS classrooms, including a classroom in the complainant's high school. We shall explore in greater detail below the relationship between defendant and the TCAPS.

This case involves the construction and application of MCL 750.520d, which provides in relevant part as follows:

-1-

(1) A person is guilty of criminal sexual conduct in the third degree if the person engages in sexual penetration with another person and if any of the following circumstances exist:

. . .

(e) That other person is at least 16 years of age but less than 18 years of age and a student at a public school or nonpublic school, and either of the following applies:

(*i*) The actor is a *teacher*, substitute teacher, or administrator of that public school, nonpublic school, school district, or intermediate school district. . . . .

(*ii*) The actor is an employee or a *contractual service provider* of the public school, nonpublic school, school district, or intermediate school district in which that other person is enrolled, or is a volunteer . . . . [Emphasis added.]

Below, the dispute focused on whether defendant qualified as a "teacher" of TCAPS under § 520d(1)(e)(*i*) or as a "contractual service provider" under § 520d(1)(e)(*ii*). With respect to the "teacher" provision, the circuit court ruled that the evidence established that defendant "was a voice teacher who provided voice instruction to voice students," but "[h]e was not . . . a teacher . . . of the public school[.]" With respect to the provision regarding "contractual service providers," the circuit court did not really directly answer the question whether it was applicable, instead launching into a discussion concerning legislative intent as reflected in the overall language of the statute.[1] The circuit court stated that "[t]he behavior that is criminal arises out of the special relationship with the school and the student whether or not it results in compensation" and "[a]dults who enjoy that relationship and abuse it for sexual purposes are violating the Act." The circuit court, in denying the motion to dismiss, concluded that "defendant was . . . allowed use of TCAPS facilities to conduct these private voice lessons during school hours and on school property," thereby creating a special relationship with and gaining access to a student that resulted in sexual penetration that would constitute a violation of MCL 750.520d.

Defendant filed an application for leave in this Court, arguing that the circuit court correctly determined that defendant was not a "teacher" under § 520d(1)(e)(*i*), that there was ample evidence that defendant was not a "contractual service provider" under § 520d(1)(e)(*ii*), and that the court improperly determined legislative intent by going beyond the plain and unambiguous language of MCL 750.520d. This Court granted defendant's application, "limited to the issues raised in the application and supporting brief." *People v Kratky*, unpublished order of the Court of Appeals, entered July 29, 2014 (Docket No. 321754).

---

[1] The court did indicate that defendant had "a contractual relationship with . . . [the complainant] and her parents[,]" but he had "no direct contractual relationship with TCAPS and ha[d] never received compensation, a W-2 or a 1099 from the public schools." This language strongly suggested that the circuit court effectively rejected the argument that defendant was a "contractual service provider."

With respect to the appropriate standard of review, this Court in *People v Lewis*, 302 Mich App 338, 341; 839 NW2d 37 (2013), observed:

> A trial court's ruling addressing a motion to dismiss is reviewed for an abuse of discretion. An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes. When a ruling involves an interpretation of the law or the application of law to uncontested facts, appellate review is de novo. The interpretation and application of a statute presents a question of law that the appellate court reviews de novo. [Citations and quotation marks omitted.]

In *People v Peltola*, 489 Mich 174, 181; 803 NW2d 140 (2011), our Supreme Court noted the general rules of statutory construction:

> Our overriding goal for interpreting a statute is to determine and give effect to the Legislature's intent. The most reliable indicator of the Legislature's intent is the words in the statute. We interpret those words in light of their ordinary meaning and their context within the statute and read them harmoniously to give effect to the statute as a whole. Moreover, "every word should be given meaning, and we should avoid a construction that would render any part of the statute surplusage or nugatory." If the statutory language is unambiguous, no further judicial construction is required or permitted because we presume the Legislature intended the meaning that it plainly expressed. [Citations omitted.]

" '[A] court may read nothing into an unambiguous statute that is not within the manifest intent of the Legislature as derived from the words of the statute itself.' " *People v Davis*, 468 Mich 77, 79; 658 NW2d 800 (2003) (citation omitted). MCL 750.2, which applies to the Michigan Penal Code, MCL 750.1 *et seq.*, thereby encompassing CSC III, provides as follows:

> The rule that a penal statute is to be strictly construed shall not apply to this act or any of the provisions thereof. All provisions of this act shall be construed according to the fair import of their terms, to promote justice and to effect the objects of the law.

When confronted with interpreting a particular term employed by the Legislature in a statute, the following rules are applicable:

> If a statute specifically defines a term, the statutory definition is controlling. When terms are not expressly defined anywhere in the statute, they must be interpreted on the basis of their ordinary meaning and the context in which they are used. However, technical words and phrases that have acquired a peculiar and appropriate meaning in law shall be construed and interpreted in accordance with that meaning. Additionally, when a term is not defined in a statute, the dictionary definition of the term may be consulted or examined. A court's reliance on dictionary definitions assists the goal of construing undefined terms in accordance with their ordinary and generally accepted meanings. However, recourse to dictionary definitions is unnecessary when the Legislature's

intent can be determined from reading the statute itself. Despite the Legislature's failure to define a term, the intent may be determined by examining the language of the statutes themselves. [*Lewis*, 302 Mich App at 342 (citations and quotation marks omitted).]

We decline to address whether defendant was a "contractual service provider" under § 520d(1)(e)(*ii*), or whether the circuit court's analysis was legally sound. Instead, we conclude, as urged by the prosecution on appeal, that defendant was a "teacher" of TCAPS for purposes of § 520d(1)(e)(*i*), making him susceptible to a prosecution for CSC III arising out of a sexual penetration involving defendant's 16-year-old student.

We first attend to some preliminary procedural matters. The issue regarding whether defendant qualified as a "teacher" under § 520d(1)(e)(*i*) is properly argued on appeal, absent the need for the prosecution to file a cross-appeal. A cross-appeal is not necessary to urge an alternative basis for affirmance; it is well-established that an appellee who does not file a cross-appeal is still entitled to argue in support of a favorable judgment on the basis of reasons or grounds that the lower court had rejected. *Middlebrooks v Wayne Co*, 446 Mich 151, 166 n 41; 521 NW2d 774 (1994). The prosecution unsuccessfully argued below that defendant was a "teacher" for purposes of § 520d(1)(e)(*i*), and it is thus permitted to argue on appeal, as an alternative basis to affirm the circuit court's ruling, that defendant's status as a "teacher" brought him within the confines of § 520d(1)(e)(*i*), without any requirement that a separate cross-appeal be filed. Furthermore, the issue of whether defendant qualified as a "teacher" falls within the scope of the order granting the application for leave, given that defendant's application specifically raised and discussed the issue. Moreover, the issue regarding whether defendant was a "teacher" under the statute is a necessary part of the analysis in soundly determining the applicability of MCL 750.520d(1)(e), which was the general subject-matter of defendant's application.

At the preliminary examination, the district court heard testimony from the choral director of the TCAPS. She testified that defendant had been "on our local teacher list that we submit to families when they request . . . additional experience for their students." When asked where the voice lessons that defendant taught took place, the choral director stated that they took "place in a practice room that . . . [was] located off of the choir room, or the instrumental room depending on what classes were meeting at that time." She further testified that defendant "had students . . . both at West Senior High where he taught in practice rooms, as well as at Central High School," which is where complainant was a student. The choral director then spoke to the question regarding when defendant would generally give voice lessons:

It would be private voice lessons, and they would happen during our choral classes. Students would come out of our classrooms to go have, for instance, a 20 to 30 minute lesson with . . . [defendant]. They may occur at times during lunchtime, because that's when students are available. And there have

-4-

been times where they might have occurred after school [in the school practice room[2]], especially as we are getting near a performance.

The choral director indicated in her testimony that TCAPS maintained a recommended "private voice teacher list" from which students and parents could choose for tutoring. She next explained how an instructor would get his or her name on the list:

> Many of these are teachers who have taught in the area, perhaps at Interlochen, who have had significant experience both as a performer and as a teacher in other communities and we know from watching them perform. When a person moves into the district perhaps that we are not aware of their background and their performance level, then we do invite them to come in and introduce themselves to our students. And, of course, we would have conversations with them prior to that student exposure. And then we watch them teach. They talk a little bit about themselves, they may sing, demonstrate their skills. This gives myself an opportunity to see how they work. Does it match the philosophy of our department and the goals for our students? So, they work with students maybe on a one-to-one, we'll take a volunteer [student], they will sing a song, we'll watch the teacher work with them, and then evaluate whether or not it would be a good fit with our students and our program. And once that happens then we place them on the list.

The choral director testified that defendant went through the screening process and was accepted for placement on the list. She also stated that everyone who seeks to be a private voice teacher at TCAPS does not make the list following the evaluation or vetting process. The choral director indicated that, at the time of the alleged incident, voice teachers had ready access to the TCAPS, absent a need to register or check in at a school's front desk. She explained the various aspects of what a voice tutor teaches students, noting that the tutors on the approved list were involved in "teaching fundamentals to our students at whatever level they are." On cross-examination by defendant, the choral director testified that defendant was not an employee of TCAPS, that he was not paid by TCAPS, that having a private voice tutor was not a class requirement, that she nor TCAPS was involved in any contractual negotiations between voice tutors and students or their parents, that private voice tutors did not have any contractual relationship with TCAPS, and that defendant also taught some students out of his home at times.

At the preliminary examination there was also testimony by the Executive Director of Human Resources and Labor Relations for the TCAPS (hereafter "HR executive director"). She testified that defendant "was a private voice teacher for our music students." The HR executive director stated that defendant was not a TCAPS employee and that defendant was not a contractual services provider. At the hearing on defendant's motion to dismiss, the HR executive director again testified. She asserted that defendant had never been hired as a teacher for the TCAPS, that TCAPS had no records of any state teacher licenses or certifications held by defendant, that defendant was never listed in personnel documents as a TCAPS teacher, that

---

[2] The choral director subsequently made the clarification contained in brackets.

defendant never received a paycheck from the TCAPS, that defendant never received any TCAPS employment benefits, that defendant did not have a teacher employee identification card as provided to TCAPS teachers, and that defendant was simply never a TCAPS teacher. The HR executive director acknowledged that defendant, after having gone through an evaluation process and being approved as a voice tutor, had been permitted access to TCAPS buildings, classrooms, and students.

Finally, at the hearing on defendant's motion to dismiss, the TCAPS Superintendant testified, and he agreed with the testimony provided by the HR executive director. He also testified in a manner consistent with the testimony of the choral director, to the extent that he had personal knowledge of any given matter.

The term "teacher" is not defined in MCL 750.520d, nor is it defined in MCL 750.520a, which contains terms and definitions applicable to CSC-related offenses. The term is also not defined in Chapter 1 of the Penal Code, MCL 750.5 through MCL 750.10a, which is the chapter covering Penal Code definitions. The term "teacher" is defined in MCL 38.71, which is part of the teachers' tenure act (TTA), MCL 38.71 *et seq.*, and which would not *appear* to encompass defendant under the listed criteria. However, MCL 38.71 provides that the definition of "teacher" is merely applicable to the TTA, and there is no logical statutory basis or rule of construction that would require extending the definition to a CSC III offense under the Penal Code. See *Lewis*, 302 Mich App at 347-348 n 9 (noting that "[t]here is no reference in the criminal statute [MCL 750.520d] to other statutes addressing teachers, and therefore, we do not consider them *in pari materia*").[3]

Given the lack of an applicable statutory definition for the term "teacher," and considering that the term "teacher" is not a technical term that has acquired a peculiar and appropriate meaning in law, we turn to the dictionary definition. A "teacher" is defined as "one that teaches" or "one whose occupation is to instruct." *Merriam-Webster's Collegiate Dictionary* (11th ed). To "teach" means "to cause to know something," and "applies to any manner of imparting information or skill so that others may learn." *Id.* There can be no reasonable dispute that defendant acted as the complainant's teacher, considering that he imparted information and skill so that she could learn to improve her voice mechanics, even assuming that defendant had no particular state teaching license or certification.

The next question is whether defendant was a teacher "of" the TCAPS. MCL 750.520d(1)(e)(*i*). In light of the fact that the TCAPS vetted defendant by making him go through an evaluation process before listing him as an acceptable voice tutor for TCAPS students, that TCAPS allowed defendant virtually unfettered access to its schools and its students during and after regular school hours, and that TCAPS expressly permitted and authorized him to actually teach students in TCAPS classrooms, including those in the high school where the complainant was a student, we hold that defendant was a teacher "of" TCAPS for purposes of MCL 750.520d(1)(e)(*i*). The fact that defendant was not an employee of TCAPS does not alter

---

[3] We note that the term "teacher" is not defined in the definition sections of the Revised School Code, MCL 380.1 *et seq.* See MCL 380.3 through MCL 380.7.

our conclusion, because MCL 750.520d(1)(e)(*ii*) expressly includes a school "employee" for coverage under the statute, which undermines any argument that a "teacher" must be an employee, given that, if such were the case, it would have been unnecessary to specifically list teachers in the statute. Furthermore, the lack of compensation or benefits from the TCAPS, the fact that the witnesses did not recognize defendant as a TCAPS teacher, and the failure of defendant to be part of any organized teaching staff or teachers' union, does not negate the undisputed evidence that defendant was teaching TCAPS students, was teaching them in TCAPS classrooms and schools during and after regular school hours, and was teaching them as expressly authorized and allowed by TCAPS personnel after undergoing a screening process. Defendant was effectively a teacher "of" TCAPS regardless of whether he was paid as a teacher or whether TCAPS thought of him as a teacher.

Moreover, our construction is consistent with the Legislature's purpose in enacting MCL 750.520d. With respect to the legislative purpose or goal behind the enactment of MCL 750.520d, the *Lewis* panel observed:

> Our review of the plain language of MCL 750.520d reveals that the Legislature intended to protect persons in a certain age group or with certain vulnerability who encounter an individual in a position of authority or supervision over those persons. A review of the statute reveals that it criminalizes sexual penetration under circumstances where an individual of a certain age, infirmity, and/or vulnerability engages in sexual penetration with an individual of a particular circumstance or relationship. [*Lewis*, 302 Mich App at 346 (citations omitted).]

Defendant was in a position of authority and supervision over the complainant arising out of the teacher-student relationship that TCAPS fully embraced by permitting defendant to teach its students in its classrooms. Our interpretation of the term "teacher" is consistent with "the fair import of the[] term[]," "promote[s] justice," and "effect[s] the objects of the law." MCL 750.2. Reversal is unwarranted.

Affirmed.

/s/ Mark T. Boonstra
/s/ William B. Murphy
/s/ Jane E. Markey