*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

KEEGAN MAITLAND, by next friend MEGHAN
MAITLAND,

        Plaintiff-Appellee,

v

HOLLY JASKIERNY, DO, and JOSEPH
KINGSBURY, DO,

        Defendants,

and

GENESYS REGIONAL MEDICAL CENTER,

        Defendant-Appellant

UNPUBLISHED
July 8, 2021

No. 348216
Genesee Circuit Court
LC No. 18-110537-NH

Before: REDFORD, P.J., and BORRELLO and TUKEL, JJ.

PER CURIAM.

In this medical malpractice action, defendant, Genesys Regional Medical Center, appeals by leave granted[1] the trial court's order denying its motion for summary disposition. The trial court concluded that a dispute of material fact prevented it from ruling on whether Genesys was vicariously liable for the alleged malpractice of defendants Dr. Holly Jaskierny, DO, and Dr. Joseph Kingsbury, DO. In doing so, the trial court agreed with plaintiff Meghan Maitland, as next friend of her minor daughter Keegan Maitland.

---

[1] This Court denied Genesys's application for leave to appeal in *Maitland v Jaskierny*, unpublished order of the Court of Appeals, entered July 11, 2019 (Docket No. 348216), but our Supreme Court remanded "this case to the Court of Appeals for consideration as on leave granted," *Maitland v Jaskierny*, 505 Mich 960 (2020).

On appeal, Genesys argues that no disputes of material fact prevent summary disposition in this case and that Dr. Jaskierny was not acting as its ostensible agent, actual agent, employee, or part of a joint venture at the time of the alleged malpractice.[2] Meghan disagrees and argues that disputes of material fact prevent any grant of summary disposition. We agree with Genesys; no dispute of material fact exists regarding the ostensible agency, actual agency, and scope of employment issues and the trial court erred by denying Genesys's motion for summary disposition on those issues. Finally, the joint venture issue is not properly before us.

## I. UNDERLYING FACTS

This case arises out the birth of Meghan's second child, Keegan. After Meghan discovered she was pregnant with Keegan, she decided to find an obstetrician for her prenatal care. Meghan searched Blue Cross's website for obstetricians near her and eventually chose Dr. Jaskierny because Meghan believed Dr. Jaskierny was a "Genesys doctor," Dr. Jaskierny's office was inside Genesys's building, and Meghan wanted a female doctor. At all relevant times, Dr. Jaskierny was employed in private practice by Joseph A. Kingsbury, DO, PC (Kingsbury PC); she was simultaneously employed by Genesys on a part time basis. Dr. Jaskierny treated Meghan at Kingsbury PC's office inside Genesys's building.

Dr. Jaskierny primarily handled Meghan's prenatal visits, but Dr. Kingsbury did treat her during one of the visits; he also was the doctor who delivered Keegan. Meghan's first prenatal appointment with Dr. Jaskierny occurred on October 18, 2011, and Meghan returned to Dr. Jaskierny regularly for prenatal visits throughout her pregnancy. On March 15, 2012, Meghan had a prenatal appointment at Dr. Jaskierny's office. Dr. Jaskierny swabbed Meghan's vagina for a "Group B test" during the appointment.[3] According to Meghan, Dr. Jaskierny did not swab her rectum.[4] The test came back negative for Strep B.

Keegan was born on April 15, 2012. Keegan's birth was quick, but otherwise uneventful. Everything appeared normal with Keegan when the Maitlands returned home from the hospital.

---

[2] The parties agree that all claims against Dr. Kingsbury have been dismissed and, therefore, the only remaining malpractice claim relates to Dr. Jaskierny's alleged malpractice.

[3] According to the Centers for Disease Control (CDC)

> Group B Streptococcus (group B strep, GBS) are bacteria that come and go naturally in the body. Most of the time the bacteria are not harmful, but they can cause serious illness in people of all ages. In fact, group B strep disease is a common cause of severe infection in newborns. While GBS disease can be deadly, there are steps pregnant women can take to help protect their babies. [Centers for Disease Control, *Group B Strep* https://www.cdc.gov/groupbstrep/index.html#:~:text=Group%20B%20Streptococcus%20(group%20B,of%20severe%20infection%20in%20newborns. (accessed April 2, 2021).]

[4] As explained by Dr. Jaskierny, the CDC and the American College of Obstetrics and Gynecologists (ACOG) recommend swabbing the vagina and anus when conducting a Strep B test. The CDC guidelines call for either one or two swabs to be used during the test.

On May 2, 2012, however, the Maitlands took Keegan to the hospital because "her color had changed from the morning" and she appeared lethargic; the doctors at the hospital told the Maitlands that Keegan's situation was "extremely serious" and that they were not sure if she would "make it." At the hospital, the doctors informed the Maitlands that Keegan had late onset meningitis. Keegan suffered serious brain damage as a result of her late onset meningitis. As of September 2018, Keegan could not move herself, had daily seizures, was "cortically blind," could not vocalize words, and required feeding.

Meghan eventually filed a complaint, alleging that Dr. Jaskierny committed medical malpractice by failing to properly perform the March 15, 2012 Group B test. This improper test allegedly led to Keegan's late onset meningitis. Meghan further alleged that Genesys was vicariously liable for Dr. Jaskierny's conduct based on multiple legal theories. Genesys then moved for summary disposition, but the trial court denied Genesys' motion because it concluded that disputes of material fact precluded any grant of summary disposition at the time. This appeal followed.

## II. STANDARD OF REVIEW

A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of a complaint and is reviewed de novo. *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 205-206; 815 NW2d 412 (2012). This Court reviews a motion brought under MCR 2.116(C)(10) "by considering the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party." *Patrick v Turkelson*, 322 Mich App 595, 605; 913 NW2d 369 (2018). "The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10)." *Barnes v 21st Century Premier Ins Co*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 347120); slip op at 4. Rather, summary disposition "is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Patrick*, 322 Mich App at 605. "There is a genuine issue of material fact when reasonable minds could differ on an issue after viewing the record in the light most favorable to the nonmoving party." *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008). "Only the substantively admissible evidence actually proffered may be considered." *1300 LaFayette East Coop, Inc v Savoy*, 284 Mich App 522, 525; 773 NW2d 57 (2009) (quotation marks and citation omitted). "Circumstantial evidence can be sufficient to establish a genuine issue of material fact, but mere conjecture or speculation is insufficient." *McNeill-Marks v Midmichigan Med Ctr-Gratiot*, 316 Mich App 1, 16; 891 NW2d 528 (2016).

The moving party has the initial burden to support its claim with documentary evidence, but once the moving party has met this burden, the burden then shifts to the nonmoving party to establish that a genuine issue of material fact exists. *AFSCME v Detroit*, 267 Mich App 255, 261; 704 NW2d 712 (2005). Additionally, if the moving party demonstrates that the nonmovant lacks evidence to support an essential element of one of his or her claims, the burden shifts to the nonmovant to present sufficient evidence to dispute that fact. *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 7; 890 NW2d 344 (2016).

## III. OSTENSIBLE AGENCY

Genesys argues that Dr. Jaskierny was not acting as its ostensible agent when she committed the alleged malpractice on March 15, 2012. We agree.

As explained by our Supreme Court in *Grewe v Mt Clemens Gen Hosp*, 404 Mich 240, 250-251; 273 NW2d 429 (1978), hospitals are generally not vicariously liable for the negligence of independent contractor physicians who use the hospital's facilities:

> Generally speaking, a hospital is not vicariously liable for the negligence of a physician who is an independent contractor and merely uses the hospital's facilities to render treatment to his patients. However, if the individual looked to the hospital to provide him with medical treatment and there has been a representation by the hospital that medical treatment would be afforded by physicians working therein, an agency by estoppel can be found.

> In our view, the critical question is whether the plaintiff, at the time of his admission to the hospital, was looking to the hospital for treatment of his physical ailments or merely viewed the hospital as the situs where his physician would treat him for his problems. A relevant factor in this determination involves resolution of the question of whether the hospital provided the plaintiff with Dr. Katzowitz or whether the plaintiff and Dr. Katzowitz had a patient-physician relationship independent of the hospital setting. [Citations omitted.]

The case law therefore requires that the principal's actions cause a belief that the doctor was its agent. See *Chapa v St. Mary's Hosp of Saginaw*, 192 Mich App 29, 33-34; 480 NW2d 590 (1991). Indeed, as stated in *Chapa*, an ostensible agency requires the following three elements:

> (1) the person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one, (2) the belief must be generated by some act or neglect on the part of the principal sought to be charged, and (3) the person relying on the agent's authority must not be guilty of negligence. [*Id.*]

When addressing the second element, the *Chapa* Court explained that "[s]imply put, defendant, as putative principal, must have done something that would create in [the patient's] mind the *reasonable* belief that [the doctors] were acting on behalf of defendant." *Chapa*, 192 Mich App at 34. "[T]he fact that a doctor used a hospital's facilities to treat a patient is not sufficient to give the patient a reasonable belief that the doctor was an agent of the hospital." *VanStelle v Macaskill*, 255 Mich App 1, 11; 662 NW2d 41 (2003). Genesys does not argue that Meghan was negligent. As such, that element of ostensible agency is not at issue on appeal.

As stated in *Grewe*, the critical question is whether Meghan sought treatment at Genesys, rather than merely viewing Genesys as the situs of treatment by her physician. Meghan's deposition testimony reflects that she looked to Genesys for treatment, as she specifically sought out Genesys doctors, and rejected those doctors who were not located within the hospital. Meghan also testified that she believed Dr. Jaskierny was a "Genesys doctor" because of her affiliation with the hospital.

Genesys argues, however, that Meghan had a preexisting relationship with Dr. Jaskierny and that this preexisting relationship prevented the formation of an ostensible agency. "[A]n independent relationship between a doctor and a patient that preceded a patient's admission to a hospital precludes a finding of ostensible agency, unless the acts or omissions of the hospital override the impressions created by the preexisting relationship and create a reasonable belief that the doctor is an agent of the hospital." *Zdrojewski v Murphy*, 254 Mich App 50, 66; 657 NW2d 721 (2002). Here, Genesys argues that Meghan had an independent relationship with Dr. Jaskierny because she had treated Meghan before the alleged malpractice occurred. But that fact is not dispositive, given that Dr. Jaskierny's office is located within the Genesys facility; thus, an argument may be made that the evidence does not show Meghan had a relationship with Dr. Jaskierny outside of the hospital setting. Further, as noted, Meghan testified that she chose Dr. Jaskierny because she was a "Genesys doctor." Thus, to the extent Meghan and Dr. Jaskierny had a doctor-patient relationship before the alleged malpractice, that relationship began as part of Meghan's prenatal care, all of which occurred at Dr. Jaskierny's office within Genesys' building. Accordingly, Meghan's deposition testimony is sufficient to withstand summary disposition based on a preexisting relationship that would prevent the formation of an ostensible agency.

The next step in the ostensible agency analysis is to determine whether Meghan's belief that Dr. Jaskierny was Genesys's agent was reasonable. Dr. Jaskierny appeared in Meghan's internet search as a doctor who practiced at Genesys hospital. Additionally, Dr. Jaskierny's office was in Genesys's building and she clearly had treating privileges in the hospital. Thus, viewing the record in the light most favorable to Meghan, her belief that Dr. Jaskierny was Genesys's agent was reasonable. The final question though, whether Genesys caused this reasonable belief, is a much closer question.

Genesys contends that Meghan's belief that Dr. Jaskierny was its agent did not arise from any act on its part. As discussed, an ostensible agency relationship requires that the hospital have engaged in some act or omission that led the patient reasonably to believe an agency existed. *Chapa*, 192 Mich App at 33-34. See also *VanStelle*, 255 Mich App at 17 (noting that the plaintiffs had not necessarily shown that the hospital defendants reasonably caused the plaintiffs to believe the doctor was acting as their agent; the mere fact that a patient goes to a hospital for treatment is insufficient).

Meghan first argues that Genesys caused her belief that Dr. Jaskierny was Genesys's agent because she discovered Dr. Jaskierny through Genesys's website. The record, however, fails to establish that Meghan found Dr. Jaskierny through a search for a doctor on Genesys's website. Rather, Meghan repeatedly testified, at her deposition, that she found Dr. Jaskierny through Blue Cross's website after she selected a tab limiting her search to Genesys doctors. Meghan did not testify that she found Dr. Jaskierny by searching for a doctor on Genesys's website or that her Blue Cross search sent her to Genesys's website. Additionally, Ryan testified that Meghan "went to the Genesys system to find someone" during the search that led her to Dr. Jaskierny. Ryan did not, however, know the name of the website Meghan used during that search. As such, reasonable minds could not view Ryan's testimony as establishing that Meghan found Dr. Jaskierny through a search of Genesys's website. Consequently, no evidence in the record establishes that Meghan found Dr. Jaskierny because of Genesys's website. Instead, the evidence establishes that Meghan learned that Dr. Jaskierny was a "Genesys doctor" because of her search on Blue Cross's website.

Thus, based on her internet search, Genesys was not responsible for Meghan believing that Dr. Jaskierny was a "Genesys doctor."

Meghan's next argument is that Genesys caused her belief that Dr. Jaskierny was Genesys's agent because Dr. Jaskierny's office was in Genesys's building. Alternatively, Meghan argues that her reasonable belief was caused by Genesys's failure to notify her that the location of Dr. Jaskierny's office did not mean Dr. Jaskierny was Genesys's employee. Meghan is correct that Genesys did not go out of its way to inform her that patients treated in Dr. Jaskierny's office were patients of Kingsbury PC and not Genesys. But this omission alone could not have caused Meghan's belief that Dr. Jaskierny was Genesys's agent. Indeed, Meghan learned of the location of Dr. Jaskierny's office from the Blue Cross website, not Genesys's. As such, for Genesys to have caused Meghan's belief that Dr. Jaskierny was its agent based on the location of Dr. Jaskierny's office it would have to have done something, or failed to do something, after Meghan already knew that information. But the bell had already been rung; at most, Genesys tacitly confirmed Meghan's belief that Dr. Jaskierny was its agent. Confirming a belief and causing a belief, however, are two different things. Additionally, the location of Dr. Jaskierny's office, without more, could not support a reasonable belief that Dr. Jaskierny was Genesys's agent. Thus, the location of Dr. Jaskierny's office did not establish an ostensible agency.

The remaining record evidence similarly fails to establish that Genesys caused Meghan's belief that Dr. Jaskierny was Genesys's agent. Dr. Jaskierny's identification badge identified her as a physician and stated "GENESYS" in large letters across the top; it did not identify her as an employee of Kingsbury PC. But Dr. Jaskierny testified at her deposition that, at the time of the alleged malpractice, she routinely left her identification badge in her vehicle and did not wear it in the hospital. Furthermore, Meghan chose Dr. Jaskierny as her doctor before she ever had an opportunity to see Dr. Jaskierny's identification badge. Consequently, Meghan would not have seen Dr. Jaskierny's identification badge when the alleged malpractice occurred and, therefore, it could not have caused Meghan to believe that Dr. Jaskierny was Genesys's agent.

Similarly, Genesys acknowledged, in its response to Meghan's interrogatories, that "the purpose of having physicians listed on the website is to allow patients to find a staff physician who has privileges at Genesys Regional Medical Center" and that "a possible benefit to Genesys Regional Medical Center, would be to provide a service to the community and also if a patient made the decision to utilize a physician listed on the website and then the patient utilized the services of Genesys Regional Medical Center, this could potentially lead to a benefit for Genesys." Indeed, Dr. Jaskierny had her own page on Genesys's website under the "Find a Physician" tab. But, as discussed, the record establishes that Meghan did not use Genesys's website when she found Dr. Jaskierny. Instead, the record establishes that Meghan found Dr. Jaskierny through Blue Cross's website. Consequently, Genesys's website could not have caused Meghan's belief that Dr. Jaskierny was Genesys's agent.

Finally, Meghan's prenatal medical records stated "Genesys Regional Medical Center" in the top left; the top right listed Drs. Kingsbury and Jaskierny as well as the address for their office. Meghan's prenatal medical records did not state whether Dr. Jaskierny treated Meghan in her capacity as an employee of Genesys or as an employee of Kingsbury PC. These records, however, were apparently generated by Kingsbury PC as part of Dr. Jaskierny's treatment of Meghan. As such, Kingsbury PC, not Genesys, was responsible for these documents. Additionally, the record

-6-

fails to establish whether Meghan ever actually saw these medical records before the alleged malpractice occurred. The record similarly fails to establish if Genesys was aware that medical records generated by Kingsbury PC stated "Genesys Regional Medical Center" in the top left. Consequently, Meghan cannot point to any act or omission by Genesys related to these documents that could have caused her reasonable belief that Dr. Jaskierny was Genesys's agent. As such, the trial court erred by denying Genesys's motion for summary disposition on this issue.

## IV. SCOPE OF EMPLOYMENT

Genesys argues that Dr. Jaskierny was not acting as its employee when she treated Meghan on March 15, 2012. We agree.

Meghan's argument that Genesys is vicariously liable for Dr. Jaskierny's alleged malpractice due to her employment with Genesys relies on the legal doctrine of respondeat superior. As explained by our Supreme Court in *Hamed v Wayne Co*, 490 Mich 1, 10-11; 803 NW2d 237 (2011):

> The doctrine of respondeat superior is well established in this state: An employer is generally liable for the torts its employees commit within the scope of their employment. It follows that "an employer is not liable for the torts . . . committed by an employee when those torts are beyond the scope of the employer's business." This Court has defined "within the scope of employment" to mean " 'engaged in the service of his master, or while about his master's business.' " Independent action, intended solely to further the employee's individual interests, cannot be fairly characterized as falling within the scope of employment. Although an act may be contrary to an employer's instructions, liability will nonetheless attach if the employee accomplished the act in furtherance, or the interest, of the employer's business. [Footnotes omitted.]

Dr. Jaskierny's employment agreement with Genesys specifically stated that it permitted her to engage in private practice. The employment agreement also established that Dr. Jaskierny must provide "on average, twenty one (21) hours per week of Services" and that she was considered Genesys's employee when engaged in these services. The agreement defined "services" as:

i. Physician shall provide one half-day (four hours) on Wednesday mornings of precepting services weekly and one (1) Friday morning (four hours) per month in the West Flint Campus Obstetrical Clinic.

ii. Physician shall provide one (1) Day Time Unit of Staff Call Service on one (1) Monday each month. Day Time Hospital Units of Service; Commence at 8:00 am and end at 5:00 pm on the same day (i.e., 9 hours). . . .

iii. Physician shall provide two (2) Night Time Units of Staff Call Service each month. Night Time Hospital Units of Service: Commence at 5:00 pm and end at 8:00 am the next morning (i.e., 15 hours). . . .

iv. "Precepting Services" means direct patient care and supervision through precepting of Residents furnishing medical services.

v. Physician will dedicate at least six (6) hours per week to development and delivery of medical student didactics, as well as provide evaluations, workshops and exit interviews.

vi. Physician shall schedule and staff resident surgeries for an average of two (2) hours weekly. . . .

vii. Physician shall participate in resident evaluation activities, faculty development and resident recruitment activities as needed.

Dr. Jaskierny opined that, between July 1, 2011 and March 15, 2012, she spent between 25% and 40% of her professional time performing the "services" defined in her employment contract with Genesys. Additionally, Dr. Jaskierny testified, at her deposition, that her prenatal treatment of Meghan was "part of [her] private practice with Dr. Kingsbury," and not "part of the work that [she] did for Genesys as far as being on call or [her] role in the residency program." Similarly, Dr. Kingsbury testified, at his deposition, that Dr. Jaskierny treated Meghan as a private practice patient.

Dr. Jaskierny clearly had many responsibilities as part of her employment contract with Genesys, but she and Dr. Kingsbury specifically testified that Dr. Jaskierny treated Meghan as her private practice patient, not in her role as Genesys's employee. Dr. Jaskierny's employment agreement with Genesys specifically permitted her to engage in private practice. Additionally, the employment agreement specified that Dr. Jaskierny acted as Genesys's employee when engaged in the "services" listed above. Meghan's Group B test did not fall within any of the "services" outlined above. That, coupled with the testimony of Drs. Jaskierny and Kingsbury, establishes that Dr. Jaskierny's alleged malpractice occurred while Dr. Jaskierny was treating Meghan in her private practice and not within the scope of her employment with Genesys. Thus, Genesys cannot be liable for Dr. Jaskierny's alleged malpractice under the theory of respondeat superior. The trial court erred by concluding that a dispute of material fact prevented a grant of summary disposition to Genesys on this issue.

## V. ACTUAL AGENCY

Genesys argues that Dr. Jaskierny was not acting as its agent when she treated Meghan on March 15, 2012. We agree.

Generally speaking, "the principal is bound by, and liable for, the agent's lawful actions performed under the auspices of the principal's actual or apparent authority." *Persinger v Holst*, 248 Mich App 499, 505; 639 NW2d 594 (2001). "It is well settled . . . that the existence and scope of an agency relationship are questions of fact . . . ." *Whitmore v Fabi*, 155 Mich App 333, 338;

399 NW2d 520 (1986).[5]  Furthermore, "[w]hen there is a disputed question of agency, if there is any testimony, either direct or inferential, tending to establish it, it becomes a question of fact." *St Clair Intermediate School Dist v Intermediate Ed Ass'n/Mich Ed Ass'n*, 458 Mich 540, 556; 581 NW2d 707 (1998) (citation and quotation marks omitted).

> Under the common law of agency, in determining whether an agency has been created, we consider the relations of the parties as they in fact exist under their agreements or acts and note that in its broadest sense agency includes every relation in which one person acts for or represents another by his authority. . . .  [T]he characteristic of the agent is that he is a business representative.  His function is to bring about, modify, affect, accept performance of, or terminate contractual obligations between his principal and third persons.  Also fundamental to the existence of an agency relationship is the right to control the conduct of the agent with respect to the matters entrusted to him. [*Id*. at 557 (quotation marks, citations, and brackets omitted).]

Indeed, "an essential component of the relationship is the principal's right to control, at least at some point, the conduct and actions of his agent." *Persinger*, 248 Mich App at 504.  Thus, Dr. Jaskierny could have acted as Genesys's agent only if Genesys had a right to control her treatment of Meghan.

Dr. Jaskierny's employment agreement with Genesys specifically provided that it "shall not be interpreted to vest in [Genesys] the authority to direct or supervise [Dr. Jaskierny] in the exercise of any medical judgment or to otherwise engage in the practice of medicine in violation of applicable law."  But the employment agreement also required Dr. Jaskierny to evaluate the performance of medical residents, have professional liability insurance coverage, treat all "staff patients"[6] with a high level of care, and maintain a high level of professional qualifications (such as being licensed and board certified).  Thus, Genesys did exhibit at least some general control over how Dr. Jaskierny practiced medicine.

Nonetheless, as explained in the preceding section addressing respondeat superior, Dr. Jaskierny was not treating Meghan on Genesys's behalf when the alleged malpractice occurred.  Instead, Dr. Jaskierny treated Meghan as her private practice patient.  This treatment fell outside the scope of Dr. Jaskierny's employment agreement with Genesys and, by extension, outside the scope of her employment.  When not acting as Genesys's employee, the only relevant limitations the employment agreement imposed on Dr. Jaskierny related to her malpractice insurance and professional qualifications.  Neither of these had anything to do with how Dr. Jaskierny chose to treat Meghan.  Thus, Genesys did not exercise control over Dr. Jaskierny when the alleged

---

[5] "Although cases decided before November 1, 1990, are not binding precedent, MCR 7.215(J)(1), they nevertheless can be considered persuasive authority." *In re Stillwell Trust*, 299 Mich App 289, 299 n 1; 829 NW2d 353 (2012) (citation omitted).

[6] The agreement defined "staff patients" as "(i) any patient listed as 'no physician assigned', (ii) all patients of the academic teaching clinics; and (iii) any patient whose attending physician does not have admitting privileges at Genesys Regional Medical Center."

malpractice occurred and, therefore, Dr. Jaskierny was not acting as Genesys's agent at that time. See *Persinger*, 248 Mich App at 504.

Nevertheless, Meghan argues that this court should affirm the trial court's order denying Genesys's motion for summary disposition on this issue because discovery was ongoing when the trial court entered its order and, therefore, any grant of summary disposition on the issue would be premature. Genesys argues that this Court should not address the discovery issue because Meghan raises it for the first time on appeal and, therefore, the argument is unpreserved. We choose to address the discovery issue because it presents as an alternative ground for affirmance. See, e.g., *Middlebrooks v Wayne Co*, 446 Mich 151, 166 n 41; 521 NW2d 774 (1994) (citation omitted) ("[A]n appellee need not take a cross appeal in order to urge, in support of relief afforded him below, reasons other than those adopted by or those rejected by the lower court."); *Mueller v Brannigan Bros Restaurants & Taverns LLC*, 323 Mich App 566, 585-586; 918 NW2d 545 (2018) (citation omitted) ("While minimal, appellate consideration is not precluded merely because a party makes a more developed or sophisticated argument on appeal. We prefer to resolve issues on their merits when possible . . . ."); *Forest Hills Co-operative v City of Ann Arbor*, 305 Mich App 572, 615 n 41; 854 NW2d 172 (2014) ("This Court will not reverse a trial court's order of summary disposition when the right result was reached for the wrong reason.").

Summary disposition "is generally premature if discovery has not been completed unless there is no fair likelihood that further discovery will yield support for the nonmoving party's position." *Liparoto Constr, Inc v Gen Shale Brick, Inc*, 284 Mich App 25, 33-34; 772 NW2d 801 (2009). "In addition, a party opposing summary disposition cannot simply state that summary disposition is premature without identifying a disputed issue and supporting that issue with independent evidence. The party opposing summary disposition must offer the required MCR 2.116(H) affidavits, with the probable testimony to support its contentions." *Marilyn Froling Revocable Living Trust v Bloomfield Hills Country Club*, 283 Mich App 264, 292-293; 769 NW2d 234 (2009) (footnotes omitted).

Meghan already has Dr. Jaskierny's employment contract with Genesys and has not specified any alternative theory that could support her actual agency argument other than that further discovery may reveal unspecified "other relationship[s] that [Dr. Jaskierny] may have had with Genesys." While Meghan's argument could be seen as raising a disputed issue, she failed to support it with independent evidence as required by MCR 2.116(H). Thus, Meghan failed to establish that granting summary disposition to Genesys on this issue would be premature. See *Marilyn Froling Revocable Living Trust*, 283 Mich App at 292-293.

## VI. JOINT VENTURE

The joint venture issue is not properly before us.

"As an error-correcting court, this Court's review is generally limited to matters actually decided by the lower court . . . ." *Jawad A Shah, MD, PC*, 324 Mich App at 210 (citation omitted). Meghan expressly asked the trial court to wait to rule on her motion to amend her complaint to add a joint venture theory of liability and Genesys concedes, in its brief on appeal, that the trial court granted this request. Additionally, Genesys argued in its brief that

-10-

[t]o the extent that [Meghan] contends that Genesys is vicariously liable for the actions of Dr. Jaskierny by virtue of the existence of a "joint venture," there is no genuine issue of material fact that Genesys is not vicariously liable for Dr. Jaskierny's treatment of [Meghan] by virtue of the existence of a joint venture, where the facts in evidence demonstrate that the required elements of a joint venture do not exist here.

Meghan does not so contend on appeal; instead, she argues that this issue is not properly before this Court because the trial court never ruled on the issue and, therefore, it was not part of the pleadings when the trial court denied Genesys's motion for summary disposition. We agree with Meghan that the issue is not properly before this Court. Meghan asked the trial court to wait to rule on her motion and Genesys did not object to that decision at the trial court level. Now, on appeal, Genesys asks this Court to address the issue in the first instance. But doing so would not be in keeping with this Court's role as an error correcting court. Meghan's motion to amend her complaint may well be futile, but the trial court did not abuse its discretion by permitting Meghan to defer a ruling on her motion until a later date.

## VII. CONCLUSION

For the reasons stated in this opinion, we reverse the trial court's order denying Genesys's motion for summary disposition and remand for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ James Robert Redford
/s/ Stephen L. Borrello
/s/ Jonathan Tukel

-11-